[No. A098354. First Dist., Div. Two. July 24, 2003.]

In re VITAMIN CASES.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.A.

COUNSEL

Law Offices of Lawrence W. Schonbrun and Lawrence W. Schonbrun for Defendant and Appellant.

Lieff, Cabraser, Heimann & Bernstein, Elizabeth Cabraser, William Bernstein, Joseph R. Saveri, Steven M. Tindall; Saveri & Saveri, Guido Saveri, R. Alexander Saveri and Geoffrey C. Rushing for Plaintiff and Respondent.

OPINION

HAERLE, J.—

## I. INTRODUCTION

This appeal challenges the attorney fees and costs awarded class counsel following settlement of numerous class action complaints brought against various manufacturers of vitamin products. Sandra Norris, the single objecting class member, raises many issues with respect to the award of attorney fees, but the main thrust of her appeal challenges the lodestar figure requested by class counsel, the multiplier that was applied to that figure, and the size of the resulting award as a percentage of the settlement fund. We reverse and remand with directions to the trial court to provide a more complete explanation for the award of fees and costs.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 1998, the first antitrust class action lawsuit brought on behalf of direct purchasers of vitamins was filed in federal district court. (*In re Vitamins Antitrust Litigation* (D.D.C. 2002) 209 F.R.D. 251, 254.) Ultimately, approximately 49 federal cases were filed and coordinated in a multidistrict litigation proceeding in the federal district court for the District of Columbia (MDL litigation). (*In re Vitamins Antitrust Litigation* (D.D.C. 1999) 1999 U.S. Dist. LEXIS 21963, 1999 WL 1335318, *1.) That coordinated action alleged a conspiracy to fix the prices of the following vitamins sold in bulk: A, B1, B2, B3, B4 (also known as choline chloride), B5, B6, B12, C, E, H, beta carotene, astaxanthin, and canthaxanthin. (Cf. *In re Vitamins Antitrust Litigation, supra,* 209 F.R.D. at p. 254 & fn. 2.)

In July 1998, a similar action on behalf of *indirect* purchasers of bulk vitamin products was filed in Yolo County, California. Other indirect purchaser actions were filed in various states across the country.

Somewhere in this time period, the United States Department of Justice (DOJ), also suspecting that price-fixing had occurred, filed a criminal information alleging that Lonza A.G. (Lonza) (not a party to this appeal) had fixed the price of vitamin B3 in violation of section 1 of the Sherman Act (15 U.S.C. § 1). On March 1, 1999, Lonza pleaded guilty to those charges. On March 2, 1999, executives and officers of Chinook, Inc., and Du Coa, L.P. (also not parties to this appeal) pleaded guilty to similar charges with respect to sales of vitamin B4.

Six days later, on March 8, 1999, Saveri & Saveri P.C. (the Saveri firm) filed a class action in San Francisco Superior Court on behalf of indirect purchasers. On March 16, 1999, Lieff, Cabraser, Heimann & Bernstein, LLP (LCHB) filed a similar action in the same court. Apparently, a third action was also filed in San Francisco Superior Court because, on April 8, 1999, the trial court filed a pretrial order establishing the procedure for litigation in those three cases. Pursuant to that order, LCHB and the Saveri firm were to serve as plaintiffs' co-liaison counsel. Those two firms, along with the Mogin Law Firm and Bainbridge & Strauss, were to serve as the executive committee, and the executive committee along with eight additional law firms were to comprise the steering committee.

Later, the trial court added four additional firms to the executive committee and 17 additional firms to the steering committee. By the time the case settled, two more firms, for a total of 10 firms, had been added to the executive committee. By that time the steering committee, which admittedly never met, was composed of 57 law firms. Thus, at the time the settlement agreement at issue here was executed, a total of 67 law firms were involved in the litigation and listed as such in a schedule attached to that agreement.

On May 14, 1999, the trial court granted a petition for coordination of the three San Francisco Superior Court actions and the single action filed in Yolo County. On May 21, 1999, a first consolidated amended complaint was filed in San Francisco Superior Court. The complaint described the plaintiff class as Californians who indirectly purchased vitamins, vitamin premixes, and/or other vitamin products from any of the named manufacturers, for use, but not for resale, at any time during the period January 1, 1988 through the late 1990's. The complaint contended that the defendants, manufacturers of "raw vitamins, ... vitamin premixes, and other bulk vitamin products for bulk sales," committed price-fixing in violation of both the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) and the Unfair Competition Act (Bus. & Prof. Code, § 17200 et seq.).

On May 20 and September 9, 1999, five of the seven defendants who are parties to the settlement agreement at issue in this case entered guilty pleas in the DOJ's criminal action in the federal district court for the District of Columbia with respect to "the sales of certain vitamins."[1]

On July 27, 1999, eleven additional cases were coordinated in San Francisco Superior Court. On August 18, 1999, three more cases were added to the coordinated proceeding, on August 26, 1999, eleven more cases, and on October 13, 1999, five more cases, were added. The total number of private antitrust class actions thus totaled 34.[2]

On November 23, 1999, plaintiffs in the federal MDL litigation filed a motion for preliminary approval of a settlement that they had reached with some of the defendants in that action. (See *In re Vitamins Antitrust Litigation, supra,* 1999 U.S. Dist. LEXIS 21963, 1999 WL 1335318, *1.) The defendants who settled in that case included the same defendants who have settled in this action. (See *ibid.*) On March 31, 2000, the federal district court granted final approval of the settlement agreement. (See *In re Vitamins Antitrust Litigation* (D.D.C. 2000) 2000 U.S. Dist. LEXIS 8931, 2000 WL 1737867, *1.)

On October 31, 2000, the California Attorney General, acting on behalf of the People of the State of California, filed an action in San Francisco Superior Court that contained allegations similar to those made in the other actions coordinated in that court. The Attorney General's complaint named only seven of the defendants named in the coordinated proceeding. On November 29, 2000, the Attorney General's lawsuit was added to the state court coordinated proceeding.

On August 29, 2001, the class representatives in the coordinated proceeding and the People filed a motion for preliminary approval of class action settlement with the seven defendants named in the Attorney General's complaint: BASF Corp., Daiichi Pharmaceutical Co., Ltd., Eisai Co., Ltd., Aventis Animal Nutrition S.A. (formerly Rhone-Poulenc Animal Nutrition, S.A.), Hoffman-La Roche, Inc., Roche Vitamins, Inc., and Takeda Chemical Industries, Ltd. (collectively, Settling Defendants). The settlement agreement

---

[1] A sixth defendant encompassed by the proposed settlement in this case, Aventis Animal Nutrition, S.A., cooperated with the DOJ and, thus, entered neither a guilty nor a nolo plea.

[2] Another case, not a class action, *Corcpork Co. v. F. Hoffman-LaRoche, Ltd.,* Kings County Superior Court No. 00C1198 (*Corcpork*), was coordinated by an order dated August 28, 2000. However, this case was not covered by the proposed settlement because its plaintiff chose to opt out of any class and, thus, its attorneys' time and expenses were not included in the proposed settlement amounts. Additionally, a *parens patriae* action filed in 2000 by the California Attorney General, although later formally coordinated with the private putative class actions, is not included in this number.

identified 36 separate state actions that it would resolve.[3] The claims released by the settlement included all claims based on the sale or pricing of vitamins A, B1, B2, B4, B5, B6, B9, B12, C, E, H, astaxanthin, beta carotene, and canthaxanthin.

The proposed settlement agreement explained that two classes would be certified for purposes of settlement only: a Consumer Class and a Commercial Class.[4] In settlement of the claims of the Consumer Class, $38 million was to be distributed to charitable, governmental and nonprofit organizations that promote the health and nutrition of consumer class members or that otherwise further the purposes underlying the lawsuit. In settlement of the Commercial Class, $42 million was to be made available for distribution to valid claimants.

On the subject of attorney fees, the proposed settlement agreement provided that "[a]s an additional payment over and above the amounts" provided for each class, the Settling Defendants agreed that they would "not pay more than $16 million in attorneys' fees." The Settling Defendants also agreed "not to object to Plaintiffs' Counsels' applications for attorneys fees consistent with" the agreement. The settlement agreement provided that if the consumer settlement was approved but the commercial settlement disapproved, the fee award would not exceed $7.6 million. If the situation was reversed and the commercial settlement approved but the consumer settlement disapproved, the fee request would not exceed $8.4 million.

On September 19, 2001, the San Francisco Superior Court ordered preliminary approval of the settlement.

On December 6, 2001, Norris filed objections to the proposed settlement and the requested attorney fees. With respect to the requested fee award, Norris argued generally that the requested fee seemed excessive and, more specifically, that there was nothing in "the Notice" that would allow review of the request for $16 million in attorney fees. She requested that the trial court order class counsel to file their time records.

On December 18, 2001, class counsel filed a motion for attorney fees and costs. The motion requested a total of $16 million in attorney fees and

---

[3] This number included the Attorney General's *parens patriae* action and the *Corcpork* case noted in the preceding footnote.

[4] Of the 34 coordinated private class actions, apparently 9 were brought on behalf of the Consumer Class and 25 on behalf of the Commercial Class. Further detail regarding the nature of the two classes is not necessary for this appeal. We note, however, that additional information can be found in *In re Vitamin Cases* (2003) 107 Cal.App.4th 820 [132 Cal.Rptr.2d 425], another appeal that arose from settlement of these same class action complaints.

$591,472.39 in costs based on the hours committed and costs incurred by attorneys at 52 firms.[5] A footnote in a memorandum of points and authorities in support of that motion explained that the executive committee intended "to allocate to Plaintiffs' Counsel any attorneys' fees awarded by the Court on the basis of each firm's <u>relative contribution</u> to the prosecution of this case. Doing so will allow the Plaintiffs' Executive Committee to recognize firms that worked particularly efficiently and to take into account the disparate billing practices of the 50 plaintiffs counsel."

In justifying the requested amount, the motion explained that, despite the guilty pleas of some of the Settling Defendants, plaintiffs still needed to prove the amount of the overcharge and the portion of the overcharge that was passed on to California indirect purchasers. The motion argued that even if the trial court were to find that 10 percent of counsel's hours should not be reimbursed, the $16 million figure could be arrived at by using a multiplier of 2.28. Plaintiffs' counsel argued that 2.28 was a multiplier that falls squarely within multipliers approved by California courts. Plaintiffs' counsel also noted that $16 million amounted to only 16.67 percent of the total settlement consideration of $96 million.

The declarations submitted in support of the motion reported that 52 firms collectively spent 25,271.88 hours on the litigation for a lodestar amount of $7,912,421.81. Collective expenses were reported to be $591,472.39. A spreadsheet was submitted that reported the number of hours claimed by each law firm in seven categories: (1) investigations and factual research, (2) discovery, (3) pleadings and motion practice, (4) settlement and mediation, (5) litigation strategy and analysis, (6) court appearances, and (7) miscellaneous. The percentage of hours attributable to each category was as follows: (1) 16.7 percent, (2) 32.9 percent, (3) 14.9 percent, (4) 19 percent, (5) 11.3 percent, (6) 1 percent, and (7) 4.2 percent. The spreadsheet also itemized the lodestar amount and expenses attributable to each of the firms.

William Bernstein of LCHB submitted a declaration in support of the motion for attorney fees. He averred that LCHB began investigating this case before March 1999, but it was not seeking fees or costs for any work

---

[5] In a supplemental letter brief filed by plaintiffs' co-liaison counsel in answer to certain questions posed by this court, that counsel stated that 54, not 52, firms "submitted requests for attorneys' fees" in these cases. But, in the same letter, they stated that 12 of the 67 firms listed on a schedule to the settlement agreement "did not file requests for fees." This suggests that a total of 55 law firms were implicated in the fee request. From the record and briefs before us, we are unable to explain these differences. In any event, of these firms, seven were not California firms, and some of the remaining firms had offices both in and out of California. Seven of the 34 coordinated private putative class actions had one law firm listed as counsel and seven others had two such firms. In 20 of the 34 cases, *three or more* law firms were listed as counsel.

performed prior to March 5, 1999, or for any work performed in connection with the federal MDL litigation because LCHB had already recovered $167,199.75 in attorney fees and was expecting reimbursement of $57,205.41 in litigation expenses.

On the issue of risk, Bernstein explained that in an indirect purchaser case such as these, "the overcharge is not necessarily passed on to an indirect purchaser; rather, some portion of the overcharge is inevitably (or at least allegedly) absorbed by the direct purchaser with the balance passed on." Bernstein reported that it was the view of Settling Defendants that "virtually none of the overcharge could be traced to the businesses in the California Commercial Class or, for that matter, to the consumers at the end of the line. Moreover, in the defendants' view, plaintiffs had an insurmountable hurdle in even attempting to determine the amount of indirect purchases from buyers within the State of California. The defendants also insisted that the alleged overcharge was minimal if it existed at all, because defendants' pricing could be explained by currency fluctuations, general inflation, and specific rising costs to the defendants."

On the issue of success, Bernstein averred that the California settlement "required Settling Defendants to pay more on a percentage basis than they were willing to pay in the other [indirect purchaser actions filed in other states]. Ultimately, Settling Defendants did reach agreement with the other states for settlement amounts which were disproportionately lower than the amount that the defendants agreed to pay in California."

Bernstein stated that his firm incurred 5.10 percent of its lodestar on investigations and factual research; 8.26 percent on discovery; 20.78 percent on pleadings, briefs and pretrial motions; 45.77 percent on settlement; 12.82 percent on litigation strategy and analysis; 1.91 percent on court appearances; and 5.36 percent on miscellaneous. According to Bernstein's declaration, LCHB's discovery efforts focused on "the massive project of reviewing and coding tens of thousands of pages of documents produced by defendants in hard copy and CD-ROM format," including the effort involved in training those individuals who conducted the document review. The firm's pleadings and motion efforts consisted of "draft[ing] and fil[ing] complaints and amended complaints, petitions to coordinate the California cases, proposed pre-trial orders regarding the organization of plaintiffs' counsel and other issues, stipulations between the parties, proposed confidentiality orders, notices of entry of the Court's orders, ... an opposition to a request to stay the litigation," a "motion for preliminary approval, the opposition to a motion to intervene, and the motions for final approval and for an award of attorneys' fees and costs."

Bernstein also submitted a report that summarized the number of hours each attorney at LCHB spent working on each category and the hourly rate at which those hours were charged. Detailed time records were submitted for in camera review.

Guido Saveri of the Saveri firm also submitted a declaration in support of the motion for attorney fees and costs. Saveri explained that the Saveri firm participated in drafting the first consolidated amended complaint. The Saveri firm also propounded a request for production of documents and a set of special interrogatories and thereafter negotiated the production of all documents that had been produced in the federal case. Together with LCHB, the Saveri firm organized and coordinated a document review and inspection program for participation by all plaintiffs' counsel.

Saveri also explained that LCBH and the Saveri firm were the principal negotiators of the settlements in this case. Saveri declared: "The settlement negotiations with defendants were many, lengthy, complex and very contentious as to each aspect of the litigation, including class definition, class certification, the ability to prove damages, pass-on, amount of damages, and the potential overlap of the California settlement with the multistate settlements." LCHB and the Saveri firm participated in drafting the lengthy, detailed and complicated settlement agreement that was the result of those settlement negotiations.

Saveri also explained that the Saveri firm had participated in all aspects of the *cy pres* program—the basis of the Consumer Class settlement—and had also participated in drafting the motion for preliminary approval, the opposition to the motion to intervene, and the motion for final approval.

Saveri reported the firm's lodestar to be $1,781,011.25 based on 4,952.75 hours. He submitted a summary of the hours worked in each category by each attorney in the firm and also submitted detailed time records for in camera review.

Steven M. Tindall, another attorney at LCHB, submitted a declaration in which he verified the authenticity of declarations submitted by 46 attorneys. Tindall explained that "[f]or all declarations that included detailed time records as an exhibit, such records are being submitted for *in camera* review as part of a separate declaration."

On January 10, 2002, plaintiffs filed a reply brief on the attorney fees issue. In that brief, they explained that Norris had not filed any valid objections. The reply was also supported by a revision to the spreadsheet submitted with the original motion. The revised spreadsheet indicated the total hours spent

working on the coordinated cases was 25,496.08 and the total lodestar claimed was $7,976,836.81.

At a hearing on January 18, 2002, Norris objected to the requested attorney fees. She challenged the number of hours claimed by class counsel on the ground that the case was "rife with duplication of effort." She also challenged some of the individual fee petitions, such as the request for fees from a law firm in Alabama, an attorney from Illinois and an attorney from Alaska. Norris claimed that there was no evidence that every attorney or firm filed a complaint or actually had a client.

Norris also challenged the requested hourly rates of many attorneys, including the $1,000 hourly rate of Joseph Alioto, Jr., and the $300 hourly rate of a 1995 law school graduate. Norris additionally contended that named partners must have been doing "blood and guts work" rather than guiding others because some of them had billed as many as 800 hours at $450 to $500 an hour.

Norris supported her contention that the lodestar figure was not properly calculated by relying on plaintiffs' counsel's expressed intent to distribute the attorney fees on the basis of each firm's relative contribution to the prosecution of these cases, to recognize firms that worked particularly efficiently, and to take into account disparate billing practices. According to Norris, this assertion meant that plaintiffs' counsel was "disingenuous" when they used these hourly figures and hourly rates to calculate a lodestar.

On the subject of the multiplier, Norris contended that the case did not warrant a multiplier of 2. According to Norris, the risk was not great because defendants agreed to criminal liability before many cases were filed, and there were numerous cases in other states and a case in federal court pending at the same time.

Norris requested that the court allow her to intervene, and she asked for a statement of decision. The court denied both requests. The court denied the motion to intervene on procedural and substantive grounds. With regard to the statement of decision, the court stated that none was required, but that it would nevertheless explain its reasoning.

The court then granted the request for $16 million in fees and $506,891.72 in costs. The court explained its decision as follows: (1) the lodestar was $8,011,746.81 "with the submitted hours having been reasonably spent and the submitted hourly rates being reasonable as well" and (2) the requested multiplier of 2 was reasonable in light of a number of factors. Those factors were that plaintiffs' counsel would need to devote substantial hours to

carrying out the settlement even after final approval is granted; the hours that plaintiffs' counsel devoted to the litigation required that they forgo other employment; plaintiffs' counsel undertook this matter solely on a contingent basis and hence with no guaranty of recovery and with significant hurdles to demonstrating damages; and plaintiffs' counsel obtained a very favorable result, which required a demonstration of skills above and beyond those that would be expected in counsel of their status, experience and expertise.

The court then performed a percentage of the benefit analysis, stating that "[t]he requested $16 million is 16.67 percent of the total settlement consideration of $96 million. ... That percentage falls well within the percentage awarded in other class action litigation in California and other jurisdictions." The court apportioned the award as $7.6 million for the consumer class and $8.4 million for the commercial class.

On that same date, the trial court filed a written order consistent with the decision it announced at the hearing. The order explained that the court relied on the "lodestar-plus multiplier method" and the percentage fee method, as independent bases for determining the amount of fees. The order stated that the "$8,011,746.81 in lodestar that Plaintiffs' Counsel have accumulated since March, 1999, was reasonable and consistent with the litigation in this case," that the hourly rates were reasonable and that the award was a reasonable percentage of the total settlement. The order identified the following factors as those the court considered: "(a) the time and labor required; (b) the contingent nature of the case; (c) the continuing obligations of plaintiffs' counsel; (d) preclusion of other employment; (e) the experience, reputation and ability of Plaintiffs' Counsel and the skill they displayed in litigation; and (f) the results achieved. [Citations.]" Relying on these factors, the court concluded that a 16.67 percent fee award was appropriate and that a multiplier of 2 was reasonable.

On February 8, 2002, the trial court denied Norris's oral motion to intervene in the action.

## III. DISCUSSION

A. *The Trial Court Was Not Required to Provide a Statement of Decision**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *The Award of Attorney Fees and Costs Must Be Reversed and Remanded to the Trial Court for Further Consideration*

Norris challenges the amount of attorney fees awarded to plaintiffs' counsel on a number of grounds. ■ Our review of the amount of attorney fees

---

* See footnote, *ante*, at page 1041.

awarded is deferential. (*Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 832 [112 Cal.Rptr.2d 284] (*Thayer*).) Because the "experienced trial judge is the best judge of the value of professional services rendered in his court," we will not disturb the trial court's decision unless convinced that it is clearly wrong, meaning that it is an abuse of discretion. (*Id.* at p. 832; *Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 25 [97 Cal.Rptr.2d 797] (*Lealao*).) However, " '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action...." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Lealao, supra,* 82 Cal.App.4th at p. 25; see also *Thayer, supra,* 92 Cal.App.4th at pp. 832–833.) When the record is unclear whether the trial court's award of attorney fees is consistent with the applicable legal principles, we may reverse the award and remand the case to the trial court for further consideration and amplification of its reasoning. (See, e.g., *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1142 [104 Cal.Rptr.2d 377, 17 P.3d 735] (Ketchum); *Thayer, supra,* 92 Cal.App.4th at p. 846; *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 629–630 [98 Cal.Rptr.2d 388] (*Ramos*).)

" '[T]he primary method for establishing the amount of "reasonable" attorney fees is the lodestar method. The lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier" to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented.' [Citation.] 'The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services.' [Citation.] Under certain circumstances, a lodestar calculation may be enhanced on the basis of a percentage-of-the-benefit analysis. [Citation.]" (*Thayer, supra,* 92 Cal.App.4th at p. 833.)

On this record, we find ourselves in a position similar to that of Division One of the Fourth Appellate District in *Ramos, supra,* 82 Cal.App.4th 615. In that case, several state actions and a federal action were filed challenging the practice of Countrywide Home Loans, Inc. (Countrywide), of imposing property insurance charges on those borrowers who failed to maintain their own insurance on their mortgaged property. (*Id.* at pp. 618–619.) The plaintiffs all contended that the "charges were being used for administrative purposes in a manner that unfairly penalized the 2 percent of homeowners/borrowers who fell into this category." (*Id.* at p. 619.) A

settlement was reached between the plaintiff class and Countrywide. (*Id.* at p. 618.) The trial court granted plaintiffs' motion for attorney fees and costs, but reduced the requested lodestar figure by $200,000 before applying a 2.5 multiplier. (*Id.* at p. 620.) The trial court explained its enhancement of the lodestar as follows: "The Court finds further that an enhancement of the lodestar fee amount is appropriate given the risks undertaken, the complexity of the issues, the skill displayed, the preclusion of other employment and the public interests served." (*Id.* at p. 620, italics omitted.)

Countrywide appealed the trial court's orders awarding attorney fees. (*Ramos, supra,* 82 Cal.App.4th at p. 618.) The Fourth District considered whether the trial court's application of a 2.5 multiplier was a proper exercise of discretion. (*Id.* at p. 623.) In doing so, it lamented that its task was "complicated by the terse nature of the trial court's ruling itself, which [gave] virtually no explanation for the basis of the substantially enhanced award of fees and costs.... Because it merely lists the enhancement factors used, without a more complete explanation of their applicability in this context, the order is subject to question regarding the factual basis of the exercise of discretion made." (*Id.* at p. 624.)

The Fourth District noted that the trial court's ruling began by stating that " '[p]laintiffs succeeded in challenging perceived abuses in forced order insurance programs for homeowners, and ... the lawsuit sent a message to other lenders in the forced order insurance industry.' " (*Ramos, supra,* 82 Cal.App.4th at p. 626.) The Fourth District interpreted this language as arguably relying on "the skilled nature of the representation and the public interest benefits conferred in setting the base amount of fees." (*Id.* at p. 626.) The court expressed concern that the trial court also used these factors to justify the enhancement. The court stated, "If the trial court's lodestar calculation already reflected such factors, its order does not adequately reveal its reasoning for a further enhancement on this account. More detailed findings are essential to permit meaningful review of the award. Similarly, the order refers to the possibility of future work required to administer the settlement, but without giving a basis for estimating the value of such work." (*Ibid.*)

The Fourth District also noted that the trial court enhanced the lodestar on the basis that the litigation precluded other employment. The Fourth District concluded that "more explicit findings would be of great assistance to this court in relating that factor to the figure chosen." (*Ramos, supra,* 82 Cal.App.4th at p. 627.) The court additionally found the trial court's enhancement of the base fee award to be somewhat inconsistent with its reduction of the lodestar by $200,000. (*Id.* at p. 627.)

The court of appeal ultimately concluded that "[u]nder all the relevant circumstances, [it] could not be justified in presuming ... that the trial court considered only appropriate factors in applying this particular multiplier to the lodestar figure.... When all applicable factors are considered, no reasonable basis for the court's action is currently evident on this record, but solely with respect to the selection of this relatively large multiplier figure. [Citation.] [¶] ... [W]hile this case presented risks for plaintiffs' counsel, it was also resolved without the risks of trial. While it involved some limited novelty of issues, it was also part of a series of related litigation. Further, as we have explained, the lodestar calculation apparently fully compensated counsel at their respective professional rates for the hours spent in the litigation. Thus, if the trial court on remand wishes to enhance the lodestar amount by a multiplier, it must more precisely articulate why such increment is appropriate. General reference to risk, novelty and skill on this record does not support the relatively large multiplier selected by the trial court." (*Ramos, supra,* 82 Cal.App.4th at p. 629.)

Here, the sheer number of private putative class actions resolved by this settlement—34—and the number of law firms seeking attorney fees—52 or more[6]—raises the specter of duplicative and superfluous litigation and hence unnecessary fees and costs. The plaintiffs were represented by highly experienced co-liaison counsel, an executive committee of eight additional law firms, and a "steering committee"—which admittedly never met—of 57 additional law firms.[7] In fact, the law firms who were not on the executive committee contributed significantly to the expense of this litigation—approximately 23 percent of the lodestar and 35 percent of the costs—without necessarily contributing an equivalent percentage of value to the litigation.[8] Perhaps even more significantly, in 20 of the 34 private coordinated class actions, *three or more* law firms were listed as plaintiff's counsel. In light of this record, we are concerned that affirmance of the trial court's award of attorney fees, without further review by that court, might further encourage what we frankly fear happened here: the filing of many substantially duplicative class actions manned by multiple law firms.

In *Thayer,* we disapproved of fee awards that reward such conduct: "while meager fee awards to successful counsel may discourage able counsel from engaging in many forms of public interest litigation that should be encouraged, the *unquestioning* award of generous fees may encourage duplicative and superfluous litigation and other conduct deserving no such favor." (*Thayer, supra,* 92 Cal.App.4th at p. 839.) We explained that "[a]bsent a lack

---

[6] See footnote 5, *ante.*

[7] Twelve of these firms did not request attorney fees.

[8] At oral argument, plaintiffs' lead counsel confirmed that these percentages were substantially accurate.

of confidence in the competence of counsel in the first filed ... case to maintain this class action—which does not appear—it is difficult to find any need for the filing of so many essentially duplicative actions in the first place. Had the four actions filed after [the first action] not been commenced, the plaintiffs in those cases would have been included in the class alleged in [that first case]. While it is therefore impossible to conclude that the filing of so many nearly identical actions significantly increased the value of this litigation to any customers of the [defendant], it did substantially increase the [defendant's] exposure to large attorney fee awards." (*Id.* at pp. 840–841.)

We further observed in *Thayer* that "[f]ederal case law raises the question whether it is appropriate *at all* to award attorney fees 'in tag-along actions—representative lawsuits brought with different named plaintiffs which substantially track actions previously brought.' [Citation.] As the [United States Court of Appeals for the Second Circuit] has pointed out, '[w]hile there is no first-in-time rule governing the award of counsel fees where multiple litigation is brought, a duplicative action which contributes virtually nothing to the ultimate result cannot justify an award of counsel fees.... [Citation.] Where [the] goal [of the litigation] is fully achieved by a single well-managed action, an award of compensation to latecomers who add nothing of value would encourage the bringing of superfluous litigation solely for an award of fees.' [Citations.]" (*Thayer, supra,* 92 Cal.App.4th at p. 841, italics added.)[9] Our Supreme Court has expressed similar limitations on fee awards, explaining that "reasonable" compensation does not include compensation for " 'padding' in the form of inefficient or duplicative efforts...." (*Ketchum, supra,* 24 Cal.4th at p. 1132.) Here the large number of law firms involved (including in particular those 20 or so cases in which three or more law firms represented the named plaintiff or plaintiffs) strongly suggests that the participation of some law firms achieved little more than to drive up the award of fees. While it is true that "a certain amount of inefficiency, waste, duplication, and even competition in the representation of the plaintiff class was inevitable and, at least in the beginning, tolerable" (*Thayer, supra,* 92 Cal.App.4th at p. 839), we reiterate that our concern is with the apparent substantial duplication of effort in this litigation when the cause was, from the beginning, ably championed by a phalanx of highly qualified law firms.

Our second major concern with the award at issue here concerns the circumstances recited in the footnote in the memorandum of points and authorities filed with the trial court to the effect that the fees might not be distributed in accordance with the lodestar attributable to each firm, but

---

[9] As we noted at this point in *Thayer*, several federal courts have labeled possibly unnecessary and duplicative actions "tag-along actions." Numerous federal court authorities have examined, with apparently increasing concern, the propriety of *any* award of attorney fees in such actions. (See cases cited in *Thayer, supra,* 92 Cal.App.4th at p. 841.)

would instead be distributed "on the basis of each firm's relative contribution to the prosecution of this case" as determined by co-liaison counsel.[10]

To be sure, one case has suggested that, in some situations, it might be appropriate to distribute fees in a manner that varies from the way in which the fees were calculated. (See *Rebney v. Wells Fargo Bank* (1990) 220 Cal.App.3d 1117, 1142–1143 [269 Cal.Rptr. 844] *(Rebney)*.) However, here, the fact that co-liaison counsel intends to distribute the attorney fees award to the law firms in a manner independent of the lodestar underscores the very concerns we have regarding the value of the services of all of the attorneys and law firms who were involved in these actions. Those issues should be resolved by the trial court *before* an award of attorney fees, rather than by co-liaison counsel *afterwards*.

We offer several additional observations regarding the award at issue here:

First, and with specific regard to the multiplier used by the trial court, we note that the risks presented by this case were not as large as plaintiffs' counsel would portray them. Like the situation in *Ramos*, this case was both resolved without the risks of trial and was similar to litigation filed throughout the country. (See *Ramos, supra,* 82 Cal.App.4th at p. 629.) Indeed, at oral argument in this case, lead plaintiffs' counsel conceded that "several" of the ten law firms on the plaintiffs' executive committee were also plaintiffs' counsel in the federal direct purchaser cases against the vitamin-producing defendants, the cases coordinated in federal court for the District of Columbia.

Second, and related to the general risk issue, liability at least as to some of the vitamins produced and sold by the defendants was effectively established by the guilty pleas of some, if not all, of them. (See 15 U.S.C. § 16(a) ["[a] final judgment or decree … rendered in any … criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto."].)

---

[10] Actually, the footnote in question stated that any such modifications would be the responsibility of the plaintiffs' executive committee. However, at oral argument, lead counsel for plaintiffs stated candidly that, in fact, such would be co-liaison counsel's responsibility. This was also the gist of a provision in the Settlement Agreement itself which provided that each plaintiff's counsel's "share of the overall fee award … [shall] be determined by the [liaison counsel] in consultation with the Plaintiffs' Executive Committee …." Although the superior court was requested to and did approve the Settlement Agreement, nothing about co-liaison counsel and the Executive Committee themselves determining the appropriate shares of the overall fee award was expressed in the orders presented to and executed by that court.

And, to the extent the guilty pleas did not cover all of the vitamins whose sales were at issue in this litigation, the MDL litigation covered allegations concerning all of the vitamins at issue in this case except B9. (*In re Vitamins Antitrust Litigation, supra,* 209 F.R.D. at p. 254 & fn. 2; *In re Vitamins Antitrust Litigation, supra,* 1999 U.S. Dist. LEXIS 21963, 1999 WL 1335318, *1–2 & fn. 2.) The Settling Defendants' willingness to settle those claims in November 1999 (except, apparently, regarding vitamin B4) also suggests there would be few obstacles in the litigation regarding liability. Indeed, and apparently for this reason, no depositions on the subject of the liability of the defendants were taken, accordingly to lead plaintiffs' counsel at oral argument.

Plaintiffs' counsel contend that even now they face risk with respect to several defendants who have not settled. However, the Settling Defendants are not responsible for that risk. Moreover, plaintiffs represented to the trial court that Settling Defendants account for 85 percent of all bulk vitamin sales and thus the remaining defendants are at most responsible for 15 percent. Thus, most of plaintiffs' recovery surely came in this settlement and whatever risk remains relates to the potential of a recovery that will be much smaller.

Third, no motion for class certification was ever made by plaintiffs' counsel and hence that battle, always a pivotal one in any case of this type and magnitude, was avoided. As a consequence, the main issue plaintiffs faced concerned the damages recoverable by indirect purchasers. However, that question rather clearly concerned more the amount of damages that might be recovered than the entitlement to any damages.

Fourth, the hourly rate of $1,000 charged by one attorney would seem to exceed all reasonable compensation.

Fifth and finally, we are concerned that, like the trial court's decision in *Ramos*, the trial court's decision here justifies the fee enhancement by referring to the possibility that the attorneys will be required to perform additional work in the future to administer the settlement, but the trial court did not give a basis for estimating the value of such work. (See *Ramos, supra,* 82 Cal.App.4th at p. 626.) The absence of such an estimation is troubling here because the trial court assigned the fee award between the two classes based on the percentage of the total award attributable to each class. However, the amount of additional work required by the two classes is surely not represented by such a calculation because the settlement provides for two very different resolutions of the Consumer and Commercial Class claims. The Consumer Class settlement requires distribution of funds to non-profit organizations,whereas the Commercial Class settlement permits individual claims to be made against a portion of the commercial settlement fund. In fact, attorney Bernstein's declaration submitted in support of the motion for attorney fees

emphasized solely the additional attorney effort that will be required to calculate the opt-out reduction for the *Commercial* Class. Thus, an assumption that the value of continuing services is somehow related to the size of the award is without foundation in this record.

Plaintiffs argue that no reconsideration of the award is necessary for a number of reasons. Some of their arguments start with the notion "even if," such as, even if 10 percent of the hours requested were not properly reimbursable, $16 million was still a proper fee award because the applicable multiplier would be only 2.28, and even if $1,000 an hour is an unreasonable hourly figure, only six hours were charged at that rate and therefore the $1,000 hourly rate had only a de minimus effect on the total lodestar.

We are simply not persuaded by these post hoc rationalizations. First, they are based on assumptions as to how the trial court would have exercised its discretion in choosing a multiplier had it stricken 10 percent of the hours or reduced the $1,000 hourly rate.

Second, we are troubled by these "even if" arguments because they are driven by the desired end result—a $16 million fee award. However, " '[t]he starting point of every fee award ... must be a calculation of the attorney's services in terms of the time he has expended on the case. Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.' " (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322 [193 Cal.Rptr. 900, 667 P.2d 704].) By focusing on justification of the $16 million award, plaintiffs' "even if" arguments run afoul of the objectivity that the lodestar/multiplier approach is designed to advance.

Plaintiffs also contend that the "result obtained" justifies the fee award. They explain that the California population represents approximately 22.7 percent of the population of all the states in which indirect purchaser actions were filed, and yet Californians will receive over 26 percent of the combined potential proceeds of the settlements of the state actions. Plaintiffs also contend that the joint Consumer and Commercial Class recovery constitutes 14.1 percent of all bulk vitamin sales by Settling Defendants attributable to California and that the award constitutes 74 percent of Settling Defendants' overcharge, assuming a 100 percent pass-on.

■ Courts may of course enhance a lodestar where "an exceptional effort produced an exceptional benefit." (*Thayer, supra,* 92 Cal.App.4th at p. 838.) Nevertheless, a quality result is not alone sufficient to obviate our other concerns in this case. Moreover, " '[t]he California cases appear to incorporate the "results obtained" factor into the "quality" factor: *i.e.,* high-quality

work may produce greater results in less time than would work of average quality, thus justifying a multiplier.' [Citation.]" (*Thayer, supra,* 92 Cal.App.4th at p. 838.) Here plaintiffs' counsel billed more than 25,000 hours and yet very few motions were filed and very little, if any, merits discovery was performed. Thus, it is not clear without further explanation that the relationship between the time expended and the result achieved justifies a multiplier of 2.

Plaintiffs also contend that our reliance on *Ramos* is misplaced. First, they question the applicability of *Ramos* because it relies on *City of Burlington v. Dague* (1992) 505 U.S. 557 [120 L.Ed.2d 449, 112 S.Ct. 2638]. In *Ketchum*, the California Supreme Court declined to follow *City of Burlington* because it rejected the policy arguments *City of Burlington* used to bar fee enhancements in certain types of cases in the federal courts. (See *Ketchum, supra,* 24 Cal.4th at pp. 1136–1137.) However, *Ramos* cites *City of Burlington* only three times. Twice *Ramos* refers to *City of Burlington* in the context of the arguments and decision in *Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629 [71 Cal.Rptr.2d 632]. (*Ramos, supra,* 82 Cal.App.4th at pp. 623, 624.) The third reference is a citation to *City of Burlington* to support the general proposition that "a well-established public policy in this area is to increase the predictability and to reduce the randomness of attorney fees awards in fee shifting cases. [Citation.]" (*Ramos, supra,* 82 Cal.App.4th at p. 626.) Thus, *Ramos'* reliance on *City of Burlington* is not of the nature to undermine the continued vitality of the *Ramos* decision (a decision which, after all, this court cited and relied upon extensively in *Thayer*).

Plaintiffs also argue that *Ramos* concludes, contrary to the law in California, that a lodestar is not appropriate unless the case is truly pioneering or high risk. The *Ramos* decision actually states that "some of plaintiffs' counsel would be paid around $800 per hour under this award. A reasonable exercise of discretion will not allow such a figure, except in truly pioneering and high risk cases." (*Ramos, supra,* 82 Cal.App.4th at p. 626.) The award to which the decision refers is the enhanced award, in other words, the award that was calculated at 2.5 times the usual hourly rate charged by counsel. Thus, the *Ramos* decision does not hold that all fee enhancements must be justified by high risk or by the truly pioneering nature of the case. It merely found that extraordinary justification was necessary for an enhanced fee award of 2.5 times the attorneys' usual hourly rates.

Relying on *Ketchum* and *Rebney*, plaintiffs also contend that it was not necessary for the trial court to give any further reasoning than it did. Neither case is instructive. In *Ketchum*, the Supreme Court actually found the record was *insufficient* on some points relating to the enhancement used by the trial court and hence remanded the matter to the trial court. (*Ketchum, supra,* 24

Cal.4th at p. 1142.) In *Rebney*, the terms of the settlement provided that $3.4 million was to be divided among numerous attorneys who had submitted claims that greatly exceeded that amount. (*Rebney, supra,* 232 Cal.App.3d at p. 1347 [284 Cal.Rptr. 113].) One attorney requested fees in the amount of $763,960, but was awarded fees in the amount of $170,000. (*Ibid.*) He challenged this decision on appeal. (*Rebney, supra,* 232 Cal.App.3d at p. 1346.) The appellate decision provides no guidance on what constitutes an adequate explanation for enhancing a lodestar figure because there was no enhancement in that case.

Finally, plaintiffs' counsel argue that the award of fees is proper because it represents only 16.67 percent of the total settlement fund. ██ However, we held in *Lealao* that a fee award may not be justified solely as a percentage of the recovery when that award will not come from the settlement fund. (*Lealao, supra,* 82 Cal.App.4th at p. 39.) We acknowledged that "in cases in which the value of the class recovery can be monetized with a reasonable degree of certainty and it is not otherwise inappropriate, a trial court has discretion to adjust the basic lodestar through the application of a positive or negative multiplier where necessary to ensure that the fee awarded is within the range of fees freely negotiated in the legal marketplace in comparable litigation." (*Lealao, supra,* 82 Cal.App.4th at pp. 49–50.) Nevertheless, "permitting the amount of the recovery to influence the fee is most justified where the amount of the recovery is not due primarily to the size of the class." (*Lealao, supra,* 82 Cal.App.4th at p. 53.) In fact, "[p]ercentage fees generally decrease as the amount of the recovery increases, on the theory many large recoveries are due merely to the size of the class, which may have no relationship to the efforts of counsel. [Citations.]" (*Lealao, supra,* 82 Cal.App.4th at p. 49, fn. 16.) This case presents just such a situation, where the size of the consumer award is clearly due to the enormous size of the class, not the average award (one or two dollars) attributable to each class member.

In sum, we believe the trial court should further review the plaintiffs' counsels' fee request with particular—but not necessarily exclusive—emphasis upon the following issues (not necessarily in order of importance):[11]

1. Whether the approximately 23 percent of fees and 35 percent of costs attributable to counsel not on the plaintiffs' executive committee (especially those counsel in the 20 or so cases in which there were three or more law firms representing the plaintiff) represented efforts which materially contributed to the favorable settlement achieved in this case;

---

[11] Although, as set forth in Part III.A, hereof, no formal statement of decision was or is required under Code of Civil Procedure section 632.

2. Whether plaintiffs' co-liaison counsel should have any power to adjust or revise the fee awards to any counsel;

3. Whether $1,000 per hour for the attorney claiming that sum is appropriate under the circumstances;

4. Whether, considering the risks involved (or arguably not involved) in this litigation, a multiplier of 2 is appropriate.

## IV. DISPOSITION

We reverse the award of attorney fees and costs in this case and remand that issue to the trial court for reconsideration in light of the specific concerns we have expressed above. Each party is to bear their own costs on appeal.

Kline, P. J., and Lambden, J., concurred.

On August 19, 2003, the opinion was modified to read as printed above.