[Nos. A120591, A120145, A120151. First Dist., Div. Five. June 30, 2009.]

CONSUMER PRIVACY CASES.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts A. through D. of the Discussion.

## COUNSEL

Law Offices of Lawrence W. Schonbrun and Lawrence W. Schonbrun for Objector and Appellant Renee Garvin.

Law Offices of John M. Lusk, Jr., and John M. Lusk, Jr., for Objector and Appellant Elaine Savage.

William F. Abbott; LeClair & LeClair and Richard LeClair III for Objectors and Appellants Michael T. Savage and Elizabeth Savage.

Calvo & Clark, Arne D. Wagner; Morrison & Forester and Maya Hoffman for Defendants and Respondents Bank of America et al.

Coughlin, Stoia, Geller, Rudman & Robbins, Pamela M. Parker, Bonny E. Sweeney; Altshuler Berzon, Michael Rubin and Peter E. Leckman for Defendants and Respondents Utility Consumers' Network, et al.

**OPINION**

**BRUINIERS, J.**[*]—

### INTRODUCTION

Appellants in this action are objectors to a class action settlement. They maintain that class members were not given adequate notice of the settlement, that the settlement was not fair, reasonable and adequate, and that the court erred in approving attorney fees to class counsel. We conclude the court did not abuse its discretion, and affirm.

### PROCEDURAL AND FACTUAL BACKGROUND

This case originated in 1999 as a suit against Bank of America, N.A., and related entities (Bank) by the Utility Consumers' Action Network (UCAN) acting on behalf of its affiliate, the Privacy Rights Clearinghouse. The case was coordinated with two similar actions against Bank, *Slayton v. Bank of America NT & SA*, and *Asatryan v. Bank of America NT & SA*, and assigned to the Honorable Richard Kramer as the coordination trial judge. A consolidated class action complaint was filed on April 30, 2003, pursuant to court order, with named plaintiffs Donovan Collier, Juan Duron, Terry Wolbert, Ki Won Rhee, Do Young Cho and Frank Cho.

The complaint alleged causes of action for unlawful and fraudulent business practices, false or misleading advertising, invasion of privacy in violation of the common law and the California Constitution, and unjust enrichment. Plaintiffs alleged that Bank, despite representations to the contrary, disclosed personal and confidential information to third party telemarketers and direct mail marketers for a fee, to enable them to market services to plaintiffs. They alleged the confidential information disclosed included account numbers, account balances, credit limits, Social Security numbers and other "sensitive" information.

---

[*]Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The parties first attempted settlement in 2004, when they engaged in three mediation sessions with former United States Magistrate Judge Edward Infante. The court tentatively certified a California class on March 9, 2005, but deferred ruling on a nationwide class to allow further discovery. The parties continued settlement negotiations over the years, and finally reached a settlement agreement in early 2007.

The settlement agreement provided that Bank would provide the following to class members: (1) waiver of deposited item return fees; (2) waiver of fees for telephone calls to its voice response unit; (3) vouchers for a $200 discount on loan fees for class members who take out a new residential first mortgage or refinance an existing residential mortgage; and (4) for class members who had a Bank-branded consumer credit card, either 12 free months of the card registry service, with a retail value of $30 or 90 days of the Privacy Assist identity theft protection service, with a retail value of $17.85. The Bank guaranteed it would continue to provide these benefits to class members until the aggregate benefit reached $10.75 million. The Bank also agreed to provide a "Privacy Toolkit"; an informational package with instructions on protecting financial privacy, to every class member who requested one. The value of the Privacy Toolkit would not count toward the aggregate benefit of $10.75 million. Additionally, the settlement agreement provided that Bank would pay a total of $3.25 million to a privacy-related *cy près* fund.

The parties agreed that Bank would not oppose class counsel's application for an award of attorney fees and expenses to be determined by the court, but not to exceed $4 million. They also agreed that Bank would not oppose the request for an award of $5,000 to each of the six named class representatives, to be paid from "any award of attorneys' fees and costs."

Following hearings to consider objections, the court entered an order approving the settlement. Pursuant to the parties' settlement agreement, the court awarded $1.75 million to the "Rose Foundation for *cy près* distribution to one or more non-profit entities that specialize in privacy-related research," education, or policy development. The court also awarded a total of $1.5 million to the following entities: Center for Democracy and Technology ($253,000); Samuelson Law, Technology, & Public Policy Clinic, University of California Berkeley School of Law ($300,000); World Privacy Forum ($275,000); American Civil Liberties Union of Northern California ($300,000); Electronic Privacy Information Center ($150,000); and Consumer Action ($222,000).

The court also certified for the purposes of settlement a "Settlement Class," as follows: "Any person who, at any time between September 9, 1995 and May 31, 2007, was a U.S. resident and '(1) Had a Bank of America

non-business checking or savings account; (2) Was a borrower on a non-business loan issued by (or acquired by) Bank of America secured by residential real estate within the United States; or (3) Had a Bank of America branded consumer credit card and a California mailing address for purposes of communicating with Bank of America. . . .' "[1]

The court entered a judgment of dismissal on October 4, 2007. Following further hearings, and after ordering supplemental submissions by the parties, the court entered a separate order awarding attorney fees and expenses. The court awarded class counsel $2,907,982 in attorney fees (based on a lodestar sum of $1,661,704, with a 1.75 multiplier) and $110,373 in expenses. The fees were awarded alternatively under the common fund doctrine, and under the "private attorney general" provisions of Code of Civil Procedure section 1021.5.[2] The court denied $951,450 in claimed attorney fees and $40,000 in claimed costs, finding that certain law firms had failed to meet their burden of proving the amount of fees sought. From the award of attorney fees, the court ordered that $5,000 be paid to each of the six individual class representatives.

Four objectors in the trial court filed appeals. Michael and Elizabeth Savage filed a timely appeal from the order approving settlement and the judgment of dismissal. Renee Garvin filed a timely appeal from the order approving settlement, the judgment of dismissal, and the order awarding attorney fees and expenses. Elaine Savage filed a timely appeal from the order awarding attorney fees and expenses and the "Order allowing filing of Order Approving Class Action Settlement Nunc Pro Tunc entered on December 4, 2007." We consider the three appeals, raising related issues, together, and issue a single opinion.[3]

---

[1] The court "[e]xcluded from the Settlement Class . . . Bank of America, any parent, subsidiary, affiliate or sister company of Bank of America, and all officers or directors who are, or who have been, employed by Bank of America or any parent, subsidiary, affiliate or sister company at any time during the Class Period."

[2] "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (Code Civ. Proc., § 1021.5.)

[3] (See *Rebney v. Wells Fargo Bank* (1990) 220 Cal.App.3d 1117, 1128 [269 Cal.Rptr. 844]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2007) ¶ 5:212, pp. 5-69 to 5-70.)

## Discussion

A.–D.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### E. *The Attorney Fees Award*

■ Appellants Renee Garvin (Garvin) and Elaine Savage[8] attack the court's award of attorney fees to class counsel. We first note that neither Garvin nor Savage challenge the total amount of the fee award in this matter, nor do they contend here that the award was excessive in light of the recovery to the class membership. Rather, they contend that any settlement process that purports, as here, to separately provide for fees is a legal fiction that is pernicious and unethical, and inherently unfair to class members. Garvin also contends that the difference between the amount awarded by the trial court in this instance ($3,018,355 inclusive of expenses) and the maximum amount of $4 million allowed by the settlement agreement was a surplus, which "under law belonged to th[e class]." We disagree as to both contentions, and will affirm the award.

The provisions Garvin finds so inherently objectionable are contained in paragraph 7(d) and paragraph 10 of the settlement agreement. They provide that class counsel would seek court approval for payment, by Bank, of not more than $4 million for attorney fees and costs, and that Bank would not oppose such an application. Bank reserved the right to seek to withdraw from the settlement if the court awarded a greater amount, but the settlement was not otherwise contingent on the fee determination. An attorney fee agreement of this type is sometimes referred to as a "clear sailing agreement." (See *Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 32 [97 Cal.Rptr.2d 797] (*Lealao*); *Weinberger v. Great Northern Nekoosa Corp.* (1st Cir. 1991) 925 F.2d 518, 520, fn. 1.)

■ Garvin claims that the " 'separate' payment scheme is a breach of class counsel's fiduciary responsibility to the class because it puts class counsel's interests in maximizing their fee ahead of class counsel's responsibility to maximize the class's recovery" and insists that this position "has

---

[*]See footnote, *ante*, page 545.

[8] Respondents urge that because Elaine Savage's sole legal argument is regarding the "structure of the settlement agreement itself," though she did not appeal from the October 4, 2007, settlement approval order, her appeal should be dismissed. Given that we are addressing Garvin's similar argument in relation to the settlement agreement, we also consider Elaine Savage's argument, though in relation to the attorney fee order from which she appealed, and hold she has likewise failed to demonstrate any reason why that order should not be affirmed.

been enshrined into class action law at both the federal and State of California level." While it is true that the propriety of "clear sailing" attorney fee agreements has been debated in scholarly circles (see Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements* (2003) 77 Tul. L.Rev. 813, 815–816; Herr, Ann. Manual for Complex Litigation (4th ed. 2009) §§ 21.662, 21.71, pp. 522–524, 533–534), commentators have also noted that class action "settlement agreement[s] typically include[] a 'clear sailing' clause . . . ." (Alexander, *Rethinking Damages in Securities Class Actions* (1996) 48 Stan. L.Rev. 1487, 1534.) In fact, commentators have agreed that such an agreement is proper. "[A]n agreement by the defendant to pay such sum of reasonable fees as may be awarded by the court, and agreeing also not to object to a fee award up to a certain sum, is probably still a proper and ethical practice. This practice serves to facilitate settlements and avoids a conflict, and yet it gives the defendant a predictable measure of exposure of total monetary liability for the judgment and fees in a case. To the extent it facilitates completion of settlements, this practice should not be discouraged." (Newberg on Class Actions (4th ed. 2002) § 15:34, p. 112, fn. omitted.)[9]

Garvin acknowledges the absence of any evidence here of misconduct by class counsel, or of any collusion between counsel and defendant Bank in negotiation of the fees. Garvin nevertheless maintains that this court "must set up a structural mechanism that protects against the dangers of class counsel's and defendant's manipulation of the settlement process," asserting that "[t]his is an issue about procedural temptation and fiduciary responsibility, not about evidence of misconduct in a given settlement negotiation. [¶] . . . [¶] . . . The *potential* for abuse is the issue." (Italics added.)

Aside from the question of whether this is an argument better addressed to the Legislature, we find no federal or California authority that has adopted Garvin's argument, and Garvin cites none. Her assertion that the practice has been "condemned" in the federal Manual for Complex Litigation is simply incorrect. The section cited by Garvin, in context, provides that *"If an agreement is reached on the amount of a settlement fund and a separate*

---

[9] Garvin includes in her appellant's appendix a critique of the practice of direct negotiation of attorney fees with settling defendants, contained in a letter dated September 17, 2007, addressed to the chair of the Standing Committee on Ethics and Professional Responsibility of the American Bar Association. The letter, which was not presented to the trial court, was authored by a number of academics and resulted primarily from objections to surreptitious separate fee arrangements in tobacco litigation undisclosed to class members. The authors urged, as Garvin does here, that the practice should be deemed per se unethical. The American Bar Association has not accepted that recommendation, nor is there any such prohibition in the State Bar Rules of Professional Conduct. The factors used in determining whether a fee is proper under California ethical standards are enumerated in Rules of Professional Conduct, rule 4-200(B)(1).

*amount for attorney fees and expenses*, both amounts must be disclosed to the class. Moreover, the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel. *The total fund could be used to measure whether the portion allocated to the class and to attorney fees is reasonable.*" (Herr, Ann. Manual for Complex Litigation, *supra*, § 21.71, p. 525, italics added.)[10] Far from condemning the practice of separate agreements on fees, the manual acknowledges such provisions, and merely requires that the total settlement amount, including fees, be used as a yardstick to measure the reasonableness of the fees. Similar fee agreements have been implicitly approved in *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794 [56 Cal.Rptr.2d 483] (*Dunk*) (Defendant agreed to pay attorney fees and costs not to exceed $1.5 million; remanded to trial court only to determine the amount of fees using a lodestar analysis); *Lealao, supra*, 82 Cal.App.4th at page 24 (Defendant agreed to pay "reasonable attorney fees as determined by the court"; remanded for consideration of additional factors in determining the amount to be awarded); *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615 [98 Cal.Rptr.2d 388] ("fee shifting" agreement for separate fees to be paid by defendant); and *Garabedian v. Los Angeles Cellular Telephone Co.* (2004) 118 Cal.App.4th 123 [12 Cal.Rptr.3d 737] (Defendant agreed to pay $14,125,000 to the extent approved by the court). (See also *Zucker v. Occidental Petroleum Corp.* (9th Cir. 1999) 192 F.3d 1323, 1325 [Defendants would not oppose request for fees and reimbursements not to exceed $2,975,000].)[11] It is further difficult to envision how the specter of attorney malfeasance that she invokes would be laid to rest were the prophylactic rule she advocates actually adopted. The Manual for Complex Litigation offers a caveat on negotiation of a lump sum settlement covering both class claims and attorney fees, observing that "[a]lthough there is no bar to such arrangements, the simultaneous negotiation of . . . attorney fees creates a potential conflict." (Herr, Ann. Manual for Complex Litigation, *supra*, § 21.71, p. 525, fn. omitted.) If fees were not negotiated simultaneously, but instead were to be subsequently determined by the court as a portion of a lump sum, as Garvin appears to suggest, any argument by counsel to enhance his or her fees from a "common fund" beyond a base lodestar amount would of necessity diminish the recovery of the class, again engendering the same conflict of interest she claims occurs here.

---

[10] Garvin cites to section 30.4 in the third edition of the Manual for Complex Litigation, which contains identical language.

[11] The trial court, as an alternative ground, awarded fees pursuant to Code of Civil Procedure section 1021.5, which contains an expressly declared legislative policy *against* payment of attorney fees out of the recovery in such circumstances. (Code Civ. Proc., § 1021.5, subd. (c); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565 [21 Cal.Rptr.3d 331, 101 P.3d 140].)

■ Our courts have always been cognizant of the inherent tension between the interests of class membership and counsel in settlement of class action litigation. " 'In any class action there is always the temptation for the attorney for the class to recommend settlement on terms less favorable to his clients because a large fee is part of the bargain.' " (*Apple Computer, Inc. v. Superior Court* (2005) 126 Cal.App.4th 1253, 1265 [24 Cal.Rptr.3d 818].) For this reason the majority of courts have found, for example, that it is impermissible to have a class representative too closely associated with the class attorney. (*Id.* at p. 1264, quoting *Susman v. Lincoln American Corp.* (7th Cir. 1977) 561 F.2d 86, 90–91.) It has also been recognized that once an agreement to settle is reached, the interests of class counsel and a defendant are no longer necessarily adverse. (See *In re General Motors Corp. Pick-Up Truck Fuel Tank* (3d Cir. 1995) 55 F.3d 768, 819–820 [" 'a defendant is interested only in disposing of the total claim asserted against it; . . . the allocation between the class payment and the attorneys' fees is of little or no interest to the defense.' . . . [¶] . . . [T]he divergence in financial incentives [between the class and counsel] creates the 'danger . . . that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees . . . .' " (citations omitted)].)

Because of the potential for fraud, collusion or unfairness, thorough judicial review of fee applications is required in all class action settlements and the fairness of the fees must be assessed independently of determining the fairness of the substantive settlement terms. (*Dunk, supra,* 48 Cal.App.4th at pp. 1808–1809.) Although presenting no evidence of any abuse here, Garvin nevertheless claims that "trial court discretion is not an adequate protection against the settling parties' ability to sacrifice class-member interests to benefit themselves." Garvin further asserts that "[b]ecause of trial courts' proclivity to approve class action settlements based upon the parties' representations, this Court cannot rely on individual trial court judges to weed out self-interested behavior by the settling parties."

■ We are unwilling to make any such assumptions. Instead, we presume that our trial judges are well aware of their responsibilities as "fiduciaries" for the protection of absent class members (*7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1151 [102 Cal.Rptr.2d 777]) " 'whose rights may not have been given due regard by the negotiating parties' " (*Dunk, supra,* 48 Cal.App.4th at p. 1801, quoting *Officers for Justice v. Civil Service Com'n, etc.* (9th Cir. 1982) 688 F.2d 615, 624). The court has a duty, independent of any objection, to assure that the amount and mode of payment of attorney fees are fair and proper, and may not simply act as a rubberstamp for the parties' agreement. (See *Garabedian v. Los Angeles Cellular Telephone Co., supra,* 118 Cal.App.4th at pp. 128–129.) " 'The evil feared in some settlements—unscrupulous attorneys negotiating large attorney's fees at the expense of an inadequate settlement for the

client—can best be met by a careful . . . judge, sensitive to the problem, properly evaluating the adequacy of the settlement for the class and determining and setting a reasonable attorney's fee . . . .' " (*Zucker v. Occidental Petroleum Corp., supra*, 192 F.3d at p. 1328, fn. 20.) Garvin fails to convince us that California trial judges are incapable of performing, or unwilling to perform, these obligations, or that the trial judge here failed to do so.

We also start from the proposition that the " 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303]; see *Graham v. DaimlerChrysler Corp., supra*, 34 Cal.4th at p. 579.) For this reason "[o]ur review of the amount of attorney fees awarded is deferential." (*In re Vitamin Cases* (2003) 110 Cal.App.4th 1041, 1051–1052 [2 Cal.Rptr.3d 358]; see also *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511].) We apply an abuse of discretion standard. (*Lealao, supra*, 82 Cal.App.4th at p. 25.) Fees approved by the trial court are presumed to be reasonable, and the objectors must show error in the award. (*Dunk, supra*, 48 Cal.App.4th at p. 1809.)

■ Turning to the fee determination made in this case, we find no error in the award. Garvin makes no specific objection here to the amount of the award, and in fact argued in the trial court that there was no "common fund" justifying a percentage recovery, and that a "lodestar" approach should be used in calculating fees. Garvin argued below that the supporting evidence for the fee rates and amounts was inadequate. Considering these objections, and expressing its own concern that support was lacking for some claims, the court conducted two subsequent hearings to obtain and review the declarations and documentary support for the requests. The trial court then used a lodestar analysis to determine the base fee, and applied a multiplier to calculate the final award. " ' "[T]he primary method for establishing the amount of 'reasonable' attorney fees is the lodestar method. The lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." [Citation.] "The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." [Citation.] Under certain circumstances, a

lodestar calculation may be enhanced on the basis of a percentage-of-the-benefit analysis. [Citation.]' [Citation.]" (*In re Vitamin Cases, supra,* 110 Cal.App.4th at p. 1052.) This approach "anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary." (*PLCM Group, Inc. v. Drexler, supra,* 22 Cal.4th at p. 1095.) " ' "Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts." ' [Citation.]" (*In re Vitamin Cases, supra,* at p. 1058.)[12] The trial court properly used the lodestar approach here, requiring plaintiffs' law firms to submit detailed support for their fee claims, and denying those claims he found unsupported.

It may be appropriate in some cases, assuming the class benefit can be monetized with a reasonable degree of certainty, to "cross-check" or adjust the lodestar in comparison to a percentage of the common fund to ensure that the fee awarded is reasonable and within the range of fees freely negotiated in the legal marketplace in comparable litigation.[13] (*Lealao, supra,* 82 Cal.App.4th at pp. 49–50; see also *Wing v. Asarco, Inc.* (9th Cir. 1997) 114 F.3d 986, 990.) While the court has discretion to do so where appropriate, it is not required. (*Lealao,* at pp. 49–50; *Ramos v. Countrywide Home Loans, Inc., supra,* 82 Cal.App.4th at p. 628.) Further, a fee award may not be justified solely as a percentage of the recovery when that award will not come from the settlement fund. (*In re Vitamin Cases, supra,* 110 Cal.App.4th at p. 1060.) Regardless of whether attorney fees are determined using the lodestar method or awarded based on a "percentage-of-the-benefit" analysis under the common fund doctrine, " '[t]he ultimate goal . . . is the award of a "reasonable" fee to compensate counsel for their efforts, irrespective of the

---

[12] We acknowledge that some federal circuits take a contrary view. See *Report of Third Circuit Task Force, Court Awarded Attorney Fees* (1985) 108 F.R.D. 237, 246–249, concluding that the lodestar method is deficient and subject to abuse when applied in cases resulting in the creation of a fund, and that the lodestar technique is a "cumbersome, enervating, and often surrealistic process of preparing and evaluating fee petitions that now plagues the Bench and Bar." (*Id.* at p. 258.) Justice Kline presents a detailed comparison of California and federal jurisprudence on this question in *Lealao, supra,* 82 Cal.App.4th 19.

[13] We note again that Garvin urged before the trial court that there was no quantifiable common fund justifying a percentage fee award. Assuming that the class settlement here could be fully monetized at the face amount of $14 million ($10.75 million plus $3.25 million), the fee and cost award of $3,018,355 is approximately 21.4 percent of this amount, and approximately 17.6 percent of the aggregate amount. " 'Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.' " (*Chavez v. Netflix, Inc.* (2008) 162 Cal.App.4th 43, 66, fn. 11 [75 Cal.Rptr.3d 413], quoting *Shaw v. Toshiba America Information Systems, Inc.* (E.D.Tex. 2000) 91 F.Supp.2d 942, 972.) A fee award of 25 percent " '[i]s the "benchmark" award that should be given in common fund cases.' " (*Lealao, supra,* 82 Cal.App.4th at p. 24, fn. 1, quoting *Six Mexican Workers v. Arizona Citrus Growers* (9th Cir. 1990) 904 F.2d 1301, 1311.) The award here is well within what have been deemed to be reasonable ranges.

method of calculation.' [Citations.]" (*Apple Computer, Inc. v. Superior Court, supra*, 126 Cal.App.4th at p. 1270.) It is not an abuse of discretion to choose one method over another as long as the method chosen is applied consistently using percentage figures that accurately reflect the marketplace. (*Chavez v. Netflix, Inc., supra*, 162 Cal.App.4th at pp. 65–66.)

As Justice Kline observed in *Lealao*, what constitutes a reasonable fee in a representative action is a complex question to which there are no easy answers. (*Lealao, supra*, 82 Cal.App.4th at p. 53.) The methodology used by the trial court was consistent with applicable law, and no abuse of discretion is shown.

### F. The Claimed "Surplus" from the Fee Award

Despite Garvin's assertion in the trial court that there was no "common fund" on which to base attorney fees, she nevertheless argues here that the attorney fees were a component of the class recovery, and that the difference between the fees and costs actually awarded ($3,018,355) and the maximum amount that Bank agreed to pay ($4 million) constitutes a "surplus" belonging to the class members. She contends that "[t]he class had a right to what Defendant made available to settle the litigation" and that therefore there is a sum of $981,645 due the class. (Emphasis omitted.)

She claims here, as she did in the trial court, that the Manual for Complex Litigation supports this rather unique theory. It does not. As discussed above, Garvin's citation from the manual that "the sum of the two amounts [class settlement and fees] ordinarily should be treated as a settlement fund for the benefit of the class" (Herr, Ann. Manual for Complex Litigation, *supra*, § 21.71, p. 525) is taken out of context and does not stand for the proposition she urges. As previously noted, the manual goes on to explain that the two amounts are treated as a "settlement fund" so that the "total fund could be used to measure whether the portion allocated to the class and to attorney fees is reasonable." (*Ibid.*) As the trial court also observed, nothing in the Manual for Complex Litigation suggests that any reduction in the claimed attorney fees be awarded to the class. "The citation of the Complex Litigation Manual does not establish otherwise. [¶] . . . [¶] . . . It doesn't say what you say it says, period. It does not allow the Court to restructure the deal of the parties, so I'm not disregarding a thing."

 Garvin's reliance on *Staton v. Boeing Co.* (9th Cir. 2003) 327 F.3d 938, is similarly misplaced. In *Staton*, an employment discrimination class action, the parties negotiated the amount of attorney fees as part of the settlement between the class and the defendant, and included as a term of the proposed decree the specific amount of attorney fees that class counsel would

receive. (*Id.* at pp. 944–945.) Rejecting that approach, the court held that in a case which involved both a statutory fee-shifting provision and an actual or putative common fund it would be permissible to *either* negotiate and settle the amount of statutory fees along with the merits of the case (with judicial approval of fees consistent with the reasonableness standard), or alternatively to negotiate and agree to the value of a common fund (including an estimated hypothetical award of statutory fees) and then apply to the court for an award from the fund, using common fund fee principles. (*Id.* at p. 972.) In the latter circumstance, where there is a single "common fund," after the court determines the fee amount "all the remaining value of the fund belongs to the class rather than reverting to the defendant." (*Ibid.*) That is not the situation presented here. Even those cases that have treated fees as part of a "constructive common fund" or a "package deal" have done so only for purposes of assessing the total value of a settlement, and to compare the allocation of benefits between counsel and the class. (See *In re General Motors Corp. Pick-Up Truck Fuel Tank, supra,* 55 F.3d at p. 820; *Apple Computer, Inc. v. Superior Court, supra,* 126 Cal.App.4th at p. 1269.) Simply put, there is a complete absence of any authority supporting Garvin's position.

Garvin's arguments that this creates a "windfall" for a defendant, and a disincentive for class members to raise objections to the fee again miss the mark. Under the terms of the agreement before us, defendant merely established the outer limits of its liability for fees, and agreed not to oppose a fee application within the defined range, without conceding the propriety of any particular amount. A court must still determine the reasonableness of the fee, and must do so whether or not there is an objection presented from the class. (*Garabedian v. Los Angeles Cellular Telephone Co., supra,* 118 Cal.App.4th at p. 129.) For the reasons previously stated, we likewise reject Garvin's allegation that there is a "judicial predisposition to go along with the parties' 'deal' " and that the fee structure here is part of a strategy by the plaintiff's class action bar to "disincentivize judicial scrutiny of their fee request." As Garvin admits, the court here did reduce the fee request, and we do not presume that any other trial judge would take the cavalier and dismissive approach to this serious task that Garvin suggests.

### G. *Objectors' Claim for Attorney Fees and Costs on Appeal*

Garvin seeks attorney fees and costs on appeal, claiming that a "class member/objector who has benefitted his or her class [or the class action mechanism generally] is entitled to an award of reasonable attorneys' fees and costs." "[T]here is no direct authority in California applying the substantial benefit doctrine to award attorney fees to an objector . . . [though] a number of federal courts have endorsed use of the doctrine to award attorney fees to an objector whose actions substantially benefit class members. . . . [¶]

The leitmotiv of all these opinions is that the objector must establish his or her efforts produced a concrete benefit for the class, allowing it to recover more (or otherwise be in an improved position) than it would have in the absence of the objector's efforts." (*Consumer Cause, Inc. v. Mrs. Gooch's Natural Food Markets* (2005) 127 Cal.App.4th 387, 397–398, citations omitted [25 Cal.Rptr.3d 514].) Garvin has made no showing of benefit to the class in pursuing this appeal, and we therefore deny the request.

### DISPOSITION

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.

The petitions of all appellants for review by the Supreme Court were denied September 30, 2009, S175305. Chin, J., did not participate therein.