Filed 11/10/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOEL I. ROOS et al.,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>HONEYWELL INTERNATIONAL, INC.,<br><br>     Defendant and Respondent, and<br><br>ART ROGERS et al.,<br><br>     Objectors and Appellants. | A142156<br><br>(San Francisco<br>Super. Ct. No. CGC-04-436205) |

Four objectors—Art Rogers, Chuck Congdon, Richard Moser, and Amanda Waldenville—appeal from the trial court's order approving an $8.15 million settlement of a class action against Honeywell International Inc. and awarding a portion of the settlement as fees to class counsel. The trial court found that the objectors failed to establish they had standing, but it then rejected Rogers's objection on timeliness grounds and rejected the other three objectors' objections on their merits. Except for the ruling on standing, we affirm. In doing so, we reject the objectors' arguments that the court improperly (1) approved the distribution of residual settlement funds and (2) awarded class counsel excessive attorney fees because the award amounted to 37.5 percent of the settlement fund.

BACKGROUND

This case began over a decade ago. The complaint generally alleged that respondent Honeywell engaged in uncompetitive and illegal conduct to increase its market share of round thermostats and to use its dominant market position to overcharge customers. Honeywell denied the allegations, "substantial motion practice and

1

discovery" ensued, the parties "vigorously litigated the case," and protracted settlement discussions were "[d]ifficult and contentious." The plaintiff class certified in February 2012 is composed of "persons residing in California who purchased one or more . . . [r]ound [t]hermostats . . . indirectly from . . . Honeywell . . . in California during the [c]lass [p]eriod for their own use and not for resale." The class period is defined as from June 30, 1986, to December 5, 2013.

In 2013, the parties reached a settlement and asked the trial court to preliminarily approve it. The court initially declined to do so because it had concerns about the notice proposed to be sent to class members to inform them about the details of the deal. These concerns were subsequently addressed to the court's satisfaction, and on February 4, 2014, the court preliminarily approved the settlement. The notice of settlement was subsequently published and distributed to class members in a manner that is not challenged in this appeal.

The notice included both short and long forms. The long version was distributed and posted on a website, and the short version was published in various print publications. These notices were written in plain English, and they included a number of advisements. In the long form, the class and class period were defined, and the amount of the proposed monetary settlement was stated, as follows: "If you are a resident of California and bought one or more Honeywell round thermostats any time between June 30, 1986 and December 5, 2013, for your own use and not for resale [¶] you could get money from an $8,150,000 settlement." (Initial capitals changed to lower case, boldface omitted.) It explained that "[a]fter deduction of attorneys' fees, the notice and claims administration costs, a service award to Class Plaintiffs, and litigation expenses, approximately $4.25 million is estimated to be available for distribution to eligible class member claimants." The short form stated, "If you bought a Honeywell Round Thermostat in California you could get $18 or more from a settlement." (Initial capitals changed to lower case, boldface omitted.)

The long form described how the funds available to claimants would be distributed: "The distribution plan provides for a payment of $18 for each Honeywell

2

Round Thermostat purchased by an eligible claimant," and it described how remaining funds not used to pay claims, attorney fees, or costs would be distributed: "[I]f the Settlement Fund is not depleted by the payment to eligible claimants, the remaining money will be distributed to public or non-profit organizations, primarily in California and Vermont. Any distributions will be approved by the Court and will further the purposes of the lawsuit or promote justice. If the total amount claimed from the Settlement exceeds the amount of the Settlement Fund, the distribution to each claimant would be reduced proportionately." Throughout this opinion, we will refer to the settlement provision authorizing the distribution of residual funds as the "*cy près* term."[1]

The notice also told class members how class counsel would be paid: "How will the lawyers be paid? [¶] . . . Class Counsel, who have advanced significant sums over many years in litigating these cases, will ask the Court for attorneys' fees of up to 37.5% of the total Settlement Funds, plus reimbursement of their costs and expenses." The notice explained that a hearing on counsel's request for fees would be held: "The Court will hold a hearing on May 2, 2014 to consider whether to approve the Settlement and a request for attorneys' fees of up to 37.5%." (Boldface omitted.) Class members were informed that additional information about counsel's fee request was available: "The attorneys' motion for fees, costs, and expenses including payments to the Plaintiff Class Representatives will be available when filed on or about April 25, 2014, at www.RoundThermostats.com."

Finally, class members were notified how they could object or exclude themselves from the settlement: "How do I object to or comment on the Settlement? [¶] . . . Any response must be postmarked by April 18, 2014, and mailed to [address]." (Boldface omitted.) "If you stay in the Settlement Class, you may object to the Settlement by April 18, 2014." Class members who wanted to exclude themselves from the settlement were

---

[1] *Cy près* is a rule of judicial construction designed to facilitate the intent of the parties who have agreed to distribute funds for charitable purposes. (Garner, Dict. of Modern Legal Usage (3d ed. 2011) p. 241.)

told that "[m]ore information on how to exclude yourself from or object to the Settlement is included in a detailed notice available at www.RoundThermostats.com."

In response to the notice, thousands of claims were submitted and no class member sought to be excluded. But four people, the objectors, filed objections. The three objectors other than Rogers, whom we discuss separately below, opposed the *cy près* term and the amount of the potential award for attorney fees. Congdon stated that he was "a member of the settlement class" and asserted "under oath that [he] purchased one or more products covered by the settlement." He objected to "the lawyers['] plan to ask for attorneys' fees in the amount of 37.5% of the settlement fund" because "there is no explanation, much less a credible explanation why [they] should recover such a high percentage." Moser asserted "under oath that [he] purchased on[e] or more products covered by the proposed settlement," and he objected that "[t]he requested attorneys' fees in the amount of 37.5% is excessive" and "[t]he proposed cy pres benefit is inappropriate." Waldenville also stated she was "a member of this class action settlement" and asserted "under oath that [she] purchased one Honeywell round thermostat as referenced in the notice." She objected on the basis that, in her view, Honeywell's conduct justified an award higher than $18 per thermostat, "especially relative to legal fees of over $3,000,000, which seems like an outrageous amount[,] almost 40%."

Meanwhile, on April 25, 2014, class counsel filed a motion for reimbursement of their fees and costs. The motion sought an award of fees in the amount of $3,056,250 plus accumulated interest. This amount represented 37.5 percent of the settlement fund, which was the limit on the amount of fees that could be awarded as represented in the settlement notice to the class. According to class counsel, the amount sought was only 20 percent of the total fees they incurred. They submitted evidence that they had spent "nearly 36,000 hours" on the case, and they maintained that their lodestar "exceeds $15 million." The objectors did not object to this evidence or offer any contradictory evidence.

A hearing to consider final approval of the settlement and the award of class counsel's fees was held on May 2, 2014. (Cal. Rules of Court, rule 3.769(g) ["Before final approval, the court must conduct an inquiry into the fairness of the proposed settlement"].) None of the objectors appeared at the hearing. The trial court then issued its final written order and judgment on May 30, 2014. It found that the settlement was "fair[,] reasonable[,] and adequate." It noted that the settlement provided up to $18 per thermostat and that this amount "captures approximately 78% of Plaintiffs' estimated damages." And it found that "Class Members who submit claims stand to recoup more than 2 times the overcharge estimated by plaintiffs' expert and between 68-99% of the retail price of the [round thermostat]."

The trial court rejected the objectors' objections. It found that Rogers failed to file his objection within the prescribed time period, and it found that this failure constituted a "waiver of the Class Member's right to object." The court also found that, "[l]ike the other Objectors, Mr. Rogers has not established that he is a member of the class."

In a section entitled "Standing of Objectors as Class Members," the trial court concluded that the three remaining objectors lacked standing because their objections did "not contain sufficient information for the court to properly determine whether the Objectors are, in fact, members of the class." The court found that these objectors failed to "submit proper declarations establishing their membership in the class. Among other defects, the declarations fail to comply with [Code of Civil Procedure] § 2015.5,"[2] which governs statements made under penalty of perjury. The court also found that the objectors did "not reference a Honeywell Round Thermostat . . . at all" and did not establish all the other prerequisites for class membership.

Notwithstanding its ruling that the objectors lacked standing, the trial court nonetheless considered their objections and rejected them on both general and specific grounds. It found the objections generally "lack[ed] evidentiary support" and failed "to address and counter evidence relating to the fairness and adequacy of the Settlement

---

[2] All further statutory references are to the Code of Civil Procedure.

[contained in court files and the parties' pleadings], all of which were readily accessible to objectors and their counsel via the Court's website." Regarding the *cy près* term, the court found that it was "consistent with . . . [section] 384[, subdivision] (b)," that there was "no authority stating that the claim value should be increased to exhaust settlement funds," and that the objection to it was "directed at a contingency that ha[s] not yet occurred." Regarding class counsel's fee request, the court explained that it had "reviewed further [but unspecified] evidence to support the requested costs" after the May 2 hearing and found the request to be "fair, just and reasonable to the Class" after considering factors such as "the results achieved, the complexity of the issues, the experience of counsel, the contingency nature of the case, the length of time from initiation to settlement, the lodestar and multiplier amounts, costs reasonably expended by counsel, [and] the amount of attorneys' fees and expenses compared to the value of the settlement." The court approved the settlement, and it awarded class counsel fees in the amount of $3,056,250, plus a pro rata portion of interest that had accumulated.[3]

The four objectors separately appealed. Class counsel filed a motion to dismiss the appeal, which this court denied on November 4, 2014, citing *Zimmerman v. Drexel Burnham Lambert Inc.* (1988) 205 Cal.App.3d 153, 161 [appellate courts reluctant to grant motions to dismiss appeals because such motions permit cases to be considered before others that precede them on the calendar]. Congdon, Moser, and Waldenville then submitted a joint opening brief, and Rogers submitted a separate opening brief. Plaintiffs filed a respondents' brief, which Honeywell joined.

---

[3] The settlement encompassed this case and a parallel action in Vermont. Class counsel informs us that the settlement, along with the proportionate amount of attorney fees incurred in the Vermont case, was approved by the Vermont trial court on July 1, 2014.

DISCUSSION

A.      *The Standard of Review.*

We review a trial court's decisions both approving a class action settlement and reviewing an amount awarded for attorney fees for an abuse of discretion.  (*In re Microsoft I–V Cases* (2006) 135 Cal.App.4th 706, 723 [review of approval of class action settlement]; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [review of amount awarded for attorney fees].)

Thus, in reviewing approvals of class action settlements, "[w]e do not substitute our notions of fairness for those of the trial court or the parties to the agreement. [Citation.]  'To merit reversal, both an abuse of discretion by the trial court must be "clear" and the demonstration of it on appeal "strong." ' "  (*In re Microsoft I–V Cases*, *supra*, 135 Cal.App.4th at p. 723.)  " '[G]reat weight is accorded the trial judge's views.' "  (*Id.* at p. 730.)  " ' "[S]o many imponderables enter into the evaluation of a settlement" [citation], an abuse of discretion standard of appellate review is singularly appropriate.' "  (*Ibid.*)

A trial court may approve only a settlement of a class action that is fair, adequate, and reasonable.  (*In re Microsoft I–V Cases*, *supra*, 135 Cal.App.4th at p. 723; *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801.)  The court has broad discretion in considering whether a proposed settlement satisfies these standards, but it should consider factors such as "the strength of the plaintiffs' case, the risk, expense, complexity and duration of further litigation as a class action, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of class members to the proposed settlement."  (*In re Microsoft I–V Cases*, at p. 723.)

In reviewing the amount of attorney fees awards, "[t]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."  (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.)  "The trial court is the best judge of the value of professional

7

services rendered in its court, and while its judgment is subject to our review, we will not disturb that determination unless we are convinced that it is clearly wrong." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134.)

B.       *The Trial Court Properly Found that Rogers's Objection Was Untimely.*

We first consider and affirm the trial court's finding that Rogers "waived his rights to object to the Settlement" because his objection "was untimely submitted." The facts surrounding the timeliness of Rogers's objections are largely undisputed. The notice of the proposed settlement required that any objection "must be postmarked by **April 18, 2014**." (Boldface in original.) When concluding that Rogers's "objection obviously [was] late," the trial court had a copy of Rogers's objection, which was dated April 18, 2014, and a copy of the envelope in which the objection was sent. The envelope has a metered-postage stamp dated April 18, 2014, but the United States Postal Service's postmark on the envelope is April 22, 2014. The evidence of this postmark is sufficient to support an inference by the court that the objection was not mailed until April 22, even if it was signed and the metered-postage stamp was attached on April 18.

Rogers does not directly argue that the trial court erred in finding that he filed his objection too late. Instead, he simply asserts that "[t]his court denied respondents['] motion to dismiss the appeal by order dated November 4, 2014," and contends that respondents "muddy the issues by focusing on the standing issues already considered by this court in ruling on the motion to dismiss." Rogers is mistaken to the extent he suggests that we cannot affirm the trial court's finding that his objection was untimely because of our earlier decision denying the motion to dismiss this appeal. A denial of such a motion does not constitute law of the case on the substantive issue underlying the motion and does not preclude a later consideration of the issue. (*Department of Industrial Relations v. Nielsen Construction Co.* (1996) 51 Cal.App.4th 1016, 1023, fn. 6; see also *Ferraro v. Southern Cal. Gas Co.* (1980) 102 Cal.App.3d 33, 40, disapproved on another ground by *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1330 [appellate court will usually deny motion to dismiss when it requires detailed examination of the record or consideration of the merits of the appeal].)

8

We conclude that substantial evidence supports the trial court's determination that Rogers's objection was untimely.  And because this determination provides a sufficient independent reason for the trial court to have rejected Rogers's claims, we decline to address his remaining arguments.

C.    *The Trial Court Incorrectly Determined that the Three Objectors Failed to Establish Standing.*

We next consider the trial court's ruling that the remaining three objectors failed to establish their standing as "members of the class" to object to the settlement and fees award.  We conclude that this ruling was mistaken because the objectors sufficiently demonstrated their standing by asserting in their objections that they were class members and by otherwise complying with the prerequisites for filing objections set forth in the notice of settlement.[4]

We begin by observing that the principles governing an objector's ability to challenge a class action settlement depend on whether the case is in federal or state court.  In federal courts, standing is governed by Article III of the United States Constitution.  "Article III of the federal Constitution imposes a 'case-or-controversy limitation on federal court jurisdiction,' requiring ' "the party requesting standing [to allege] 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues.' " ' [Citation.]  There is no similar requirement in our state Constitution.  [Citation.]" (*Grosset v. Wenaas* (2008) 42 Cal.4th

---

[4] On appeal, the parties conflate the objectors' standing to object to the settlement in the trial court with their standing in this court to appeal the trial court's rulings.  All four objectors have standing to appeal.  The three objectors have standing to appeal because the trial court rejected their objections for substantive reasons. (*Rebney v. Wells Fargo Bank* (1990) 220 Cal.App.3d 1117, 1128-1132.)  And Rogers has standing to appeal the ruling rejecting his untimely objection because orders preventing parties from effectively intervening in a case are appealable.  In the "context of a class settlement, objecting is the procedural equivalent of intervening." (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 253 (*Wershba*).)  Generally, when a ruling "in essence" denies leave to intervene in an action, the aggrieved party may challenge it on appeal, provided that it constitutes a final determination of the party's entitlement to participate in the action. (*In re Veterans' Industries, Inc.* (1970) 8 Cal.App.3d 902, 916; see *Jun v. Myers* (2001) 88 Cal.App.4th 117, 122-123.)

1100, 1117, fn. 13; see Cal. Const., art. VI, § 10 [empowering superior court to adjudicate any "cause" brought before it]; *National Paint & Coatings Assn. v. State of California* (1997) 58 Cal.App.4th 753, 761-762 ["Our state Constitution contains no 'case or controversy' requirement"]; *Langford v. Superior Court* (1987) 43 Cal.3d 21, 36, fn. 6 ["California's [standing] requirements are less stringent than those imposed by federal law"].)

Rather than being bound by the exacting requirements of "concrete interest" of Article III, California courts are guided by " 'prudential' " considerations in evaluating a party's ability to litigate an issue. (*Matrixx Initiatives, Inc. v. Doe* (2006) 138 Cal.App.4th 872, 877-878.) Thus, in California courts, "[o]ne who invokes the judicial process [has] 'standing' if he, or those whom he properly represents, [has] a real interest in the ultimate adjudication because the actor has []either suffered []or is about to suffer any injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented." (*California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 22-23; *Calvert v. County of Yuba* (2006) 145 Cal.App.4th 613, 629.) Stated another way, litigants in California have standing when they can show "a personal interest in the litigation's outcome." (*Torres v. City of Yorba Linda* (1993) 13 Cal.App.4th 1035, 1046; *Bilafer v. Bilafer* (2008) 161 Cal.App.4th 363, 370.) And this is true regardless of whether they can satisfy the more rigorous federal standards arising out of Article III.[5] (See *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 439-440.)

---

[5] Some California decisions suggest that state courts should look to federal decisions when considering issues of class-action standing. (See *Consumer Cause, Inc. v. Mrs. Gooch's Natural Food Market, Inc.* (2005) 127 Cal.App.4th 387, 395-396; *Trotsky v. Los Angeles Fed. Sav. & Loan Assn.* (1975) 48 Cal.App.3d 134, 139.) But appreciating the differences between federal and state standing principles helps prevent the inadvertent incorporation of federal jurisdictional precepts into state rules on standing. (*Jasmine Networks, Inc. v. Superior Court* (2009) 180 Cal.App.4th 980, 989-993.) Such incorporation can lead to the mistaken view that statutory or other preconditions for objecting to class settlements, such as the objections' timing and form requirements, control the question of standing. As the court pointed out in *Jasmine*

10

The trial court ruled that the objectors failed to establish their standing because they did not prove their class membership by submitting "proper declarations" in compliance with section 2015.5, which governs statements made under penalty of perjury, and did not otherwise prove they were, "in fact, members of the class." We conclude that this burden was too onerous under the circumstances.

To be sure, class membership is an essential prerequisite for standing to object. Objectors to a class settlement who are not members of the class typically cannot demonstrate standing—under either the federal case-or-controversy standard or under the state personal-interest standard—because they will not be affected by the settlement. (See Rubenstein, Newberg on Class Actions (5th ed. 2011) § 13:22.) But the nature of the evidence needed for objectors to show their class membership is governed by the notice of settlement, not by evidentiary requirements about which they are never told. The notice here, in the section entitled "How do I object to or comment on the Settlement?" (boldface omitted) explained that "[i]f you have not excluded yourself and if you have comments about, or disagree with, any aspect of the Settlement, you may express your views to the Court by writing to the address below. *Include your name, address, telephone number, the case name and number, proof of purchase, a brief explanation of your comment or objection, and your signature.*" (Italics added.) All three objectors submitted objections that included their names, addresses, telephone numbers, the case name and number, an explanation of their objections, and their signatures.

All three objectors also asserted that they were class members and had purchased a product covered by the settlement. Specifically, Congdon stated he was "a member of

_____

*Networks*, "The term [standing] is sometimes used . . . to describe some particular *substantive condition* imposed by the Legislature on a statutory cause of action." (*Jasmine Networks*, at p. 993, italics in original.) But "such conditions on suit possess no special qualities. They are not jurisdictional, as evidenced by the fact that they can be forfeited by a defendant who fails to seasonably assert them. [Citation.] We question the utility of cloaking them in the quasi-jurisdictional mantle of 'standing.' " (*Ibid.*; see also 13A Wright et al., Fed. Prac. & Proc., Standing (3d ed. 2008) § 3531, p. 1.)

the settlement class" and asserted "under oath that [he] purchased one or more products covered by the settlement." Moser asserted "under oath that [he] purchased on[e] or more products covered by the proposed settlement." And Waldenville also stated she was "a member of this class action settlement," and asserted "under oath that [she] purchased one Honeywell round thermostat as referenced in the notice." Although no additional proof of purchase was provided, respondents concede that such proof was unnecessary for claimants seeking a refund for two or fewer thermostats.

Nowhere in the notice were objectors told that they needed to establish each and every element of class membership, much less do so in compliance with section 2015.5. True enough, a section of the notice listed the criteria for membership in the class, which excluded class members if they bought a thermostat but resold it, bought a thermostat directly from Honeywell, or bought a thermostat as a pre-installed fixture in a real property transaction. But the notice did not say that objectors had to show, much less under penalty of perjury, that they fell outside these exclusions. And although class counsel questioned and contested the objectors' standing by, for example, pointing to an objector's out-of-state address, they presented no evidence to rebut the objectors' statements that they were class members. We conclude that the objectors sufficiently established their personal interest in the settlement by stating that they were class members who had purchased a thermostat covered by the settlement and by otherwise complying with the notice's requirements. (See *Wershba*, *supra*, 91 Cal.App.4th at pp. 235-236 [suggesting failure to submit documentary proof of class membership does not resolve standing question when "the notice to class members did not clearly inform" the objectors that such proof was required].)

Accordingly, we conclude that the trial court's ruling that the objectors failed to establish their standing was incorrect, and we therefore turn to the objectors' substantive arguments.

*D.*     *The Trial Court Properly Approved the* Cy Près *Term and Awarded Attorney Fees.*

The three objectors argue that the trial court improperly approved the settlement's *cy près* term and the amount of fees awarded to class counsel. We ultimately reject these arguments, but we first dismiss respondents' claim that the three objectors waived these arguments by failing to assert them below. In fact, these arguments were made in the trial court. As we have discussed, Congdon specifically objected that "the lawyers plan to ask for attorneys' fees in the amount of 37.5% of the settlement fund. However, there is no explanation, much less a credible explanation why [they] should recover such a high percentage." Moser objected that "[t]he requested attorneys' fees in the amount of 37.5% [was] excessive" and "[t]he proposed cy pres benefit [was] inappropriate." And Waldenville objected that Honeywell's conduct justified an award higher than $18 per thermostat "especially relative to legal fees of over $3,000,000, which seems like an outrageous amount[,] almost 40%." These collective objections sufficiently preserved the objectors' ability to argue on appeal that the *cy près* term should not have been approved and that the award of attorney fees to class counsel was excessive.

At the same time, however, we conclude that the three objectors failed to raise, and thereby forfeited, their specific argument that they were deprived of adequate information to contest the fees because the motion for reimbursement was filed after the settlement was preliminarily approved. Although Congdon raised this argument below, none of the three objectors reiterated the argument on appeal until their reply brief. Points not raised in a party's opening brief are considered abandoned unless good reason is shown for failing to raise them. (*Roehl v. Ritchie* (2007) 147 Cal.App.4th 338, 352.) No such reason has been shown here, and we accordingly limit our analysis to the issues whether the trial court improperly approved the *cy près* term and whether the fees awarded to class counsel were excessive.

13

1. The trial court properly exercised its discretion in approving the *cy près* term.

Under the settlement, the claims administrator is to review claims submitted by class members and determine which ones should be approved. A full award of $18 per thermostat is to be made if the settlement funds allow for it after attorney fees and other costs are deducted. If they do not, payments are to be reduced pro rata. But if residual funds remain after full awards are made, they are to be distributed under the *cy près* term "consistent with [section] 384," which allows distributions to certain nonprofit organizations. Before a distribution can be made to a particular entity, the distribution must be approved by the trial court.

The three objectors argue that the trial court erred in approving the *cy près* term because the court did not consider distributing the residual funds to the class claimants. The court rejected the argument when Moser made it below because Moser had pointed "to no authority stating that the claim value must be increased to exhaust settlement funds" and because the objection was "directed at a contingency that has not yet occurred." We agree with the trial court. California law specifically authorizes such a distribution, and one is particularly appropriate in cases, such as this one, where the class members will necessarily obtain full relief before the provision is triggered.

Under section 384, subdivision (b), after the trial court receives a report of "the total amount that was actually paid to the class members[,] . . . the court shall amend the judgment to direct the defendant to pay the sum of the unpaid residue, plus interest . . . to nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons, or that promote the law consistent with the objectives and purposes of the underlying cause of action, to child advocacy programs, or to nonprofit organizations providing civil legal services to the indigent." This provision was adopted by the Legislature "to ensure that the unpaid residuals of class action litigation are distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action, or to promote justice for all Californians." (§ 384, subd. (a).)

14

The propriety of a *cy près* term might be less certain if a proposed settlement asked class members to accept paltry relief, but that is not the case here. The *cy près* term only comes into play if the full award of $18 per thermostat is made to eligible claimants. In findings that have never been contested, the trial court found that the settlement "captures approximately 78% of [the class's] estimated damages" and claimants "stand to recoup more than 2 times the overcharge estimated by plaintiffs' expert and between 68-99% of the retail price of the [round thermostat]."

We conclude it was well within the trial court's discretion to approve the *cy près* term since it is authorized by state law and will be triggered only if claimants receive a recovery that adequately compensates them for their injuries.

2. The trial court properly exercised its discretion in awarding attorney fees.

The three objectors contend that the trial court abused its discretion in awarding attorney fees because the award amounted to 37.5 percent of the settlement funds. They contend that an award of fees amounting to such a high percentage of the settlement funds is impermissible under certain federal authority, which they urge us to adopt. They also argue that the court abused its discretion in awarding fees because it inadequately reviewed class counsel's billing records. We are not persuaded by either argument.

a. *Additional background.*

The notice to the class of the proposed settlement in this case included a section entitled "How will the lawyers be paid?" (Boldface omitted.) This section explained that class counsel "will ask the Court for attorneys' fees of up to 37.5% of the total Settlement Funds." All parties agree that the approval of the notice containing this language effectively capped the amount of fees that could be awarded to class counsel at 37.5 percent of the settlement fund.

In California, a provision providing for the payment of attorney fees in an application to approve a settlement of a California class action must identify how the fees are to be paid. (Cal. Rules of Court, rule 3.769(b).) Counsel seeking the fees have the

15

burden to establish the reasonableness of the request, and in most instances fees are awarded, as they were here, upon noticed motion. (§ 1033.5, subd. (c)(5).)

In their motion requesting fees, class counsel sought $3,056,250 for fees, an amount equal to 37.5 percent of the $8.15 million settlement. With their motion, they submitted evidence that they had spent "nearly 36,000 hours" on the case. They multiplied the number of hours spent on the case by a reasonable hourly rate to come to a total figure that "exceed[ed] $15 million." This meant that the amount of fees requested by virtue of the cap came to about 20 percent of the total fees that class counsel claimed to have incurred.

The objectors did not challenge class counsel's evidence about the number of hours billed, the appropriate billing rate for this type of case, the procedural history or complexity of the litigation, or counsel's experience.[6] But they did contend that the size of the potential fees award as a percentage of the settlement fund was excessive as a matter of law. Thus, we limit our review to this contention.

### b. The applicable legal standards.

We begin by discussing the applicable legal standards. When a settlement of a class action provides for the payment of fees, the "fairness of the fees must be assessed independently of determining the fairness of the substantive settlement terms." (*Consumer Privacy Cases* (2009) 175 Cal.App.4th 545, 555.) "The court has a duty, independent of any objection, to assure that the amount and mode of payment of attorney fees are fair and proper, and may not simply act as a rubberstamp for the parties'

---

[6] The uncontested evidence shows that the litigation was long and protracted. It involved federal proceedings, multiple appeals, extensive discovery, and copious motions, including two motions for class certification and two motions for summary judgment. In the trial court's words, the "parties vigorously litigated this case for nearly a decade." Each law firm representing the class submitted declarations identifying the name and position of each biller, the tasks performed by each person, the category, the number of hours devoted to each task and category, and the resulting lodestar amounts. Evidence was also submitted showing that the fee award, which reflected a rate of $85 for each hour worked, was significantly lower than the average hourly market rate charged in complex antitrust actions and was lower than the average hourly market rate class counsel had been awarded in other cases.

16

agreement." (*Ibid.*) This duty arises because a request for fees under a settlement agreement "represents a departure from the norms of the justice system. The defendants, having settled, have little interest in the division of the spoils. Individual class members, whose numbers are scattered and who often lack a singular interest sufficient to prompt intervention, rarely object. . . . [¶] Because the adversarial system breaks down at this point of litigation, just as the interests of the class and its counsel begin to diverge, the Court effectively becomes a fiduciary whose charge is to protect the class against excessive fees." (*In re AOL Time Warner, Inc. Securities and "ERISA" Litigation*, (S.D.N.Y., Oct. 25, 2006, No. 02 CIV. 5575) 2006 WL 3057232, at *8; see also *Consumer Privacy Cases*, at p. 555.)

Normally, parties in litigation are required to bear their own attorney fees under what is known as the "American rule." (See *Musaelian v. Adams* (2009) 45 Cal.4th 512, 516.) Two exceptions to this rule are relevant here. The first is when a statute provides for attorney fees to be awarded to the prevailing party. This exception is referred to as "fee-shifting" because it shifts responsibility for paying the fees to the wrongdoer. (*Lealao v. Beneficial California, Inc*. (2000) 82 Cal.App.4th 19, 26 (*Lealao*).) Fee-shifting statutes usually further a socially desirable policy, such as encouraging the enforcement of certain laws by parties who have comparatively fewer resources. (*Turner v. Association of American Medical Colleges* (2011) 193 Cal.App.4th 1047, 1060.)

The second exception to the American rule is when litigation results in a monetary fund for the benefit of a class, such as in this case. These cases are known as "common-fund" cases, and they permit attorney fees to be paid out of the fund. (*Lealao, supra,* 82 Cal.App.4th at p. 26.) Allowing fees to be paid from the fund is justified by the notion that the class would be unjustly enriched if it were allowed to benefit from the litigation without sharing in its costs. (*Boeing Co. v. Van Gemert* (1980) 444 U.S. 472, 478.) Because the costs of attorney fees are spread among the entire class, this exception is sometimes referred to as "fee-spreading." (*Lealao*, at p. 26.)

17

In fee-shifting cases, requests for attorney fees are typically measured under the lodestar method.  Under this method, the trial court multiplies the hours class counsel reasonably expended by reasonable hourly rates, and this calculation can be enhanced or reduced by a multiplier depending on a number of factors.  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)  These factors include the novelty and difficulty of the issues, the skill displayed by class counsel, the extent to which the litigation precluded other work by class counsel, the relief obtained, and the contingent nature of the fee award.  (*Ibid.*)  In California courts, the lodestar method is the primary basis for calculating and awarding attorney fees.  (*Serrano v. Priest* (1977) 20 Cal.3d 25, 48, fn. 23.)  " 'The starting point of every fee award, once it is recognized that the court's role in equity is to provide just compensation for the attorney, must be a calculation of the attorney's services in terms of the time he has expended on the case.  Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.' "  (*Ibid.*, quoting with approval *City of Detroit v. Grinnell Corp*. (2d Cir. 1974) 495 F.2d 448, 470.)  By separating the fee award from the substantive relief obtained, the lodestar method encourages counsel to accept cases the Legislature has deemed to be socially beneficial but may be difficult to evaluate because the relief may include injunctive and other nonmonetary remedies.  (*Lealao*, *supra*, 82 Cal.App.4th at p. 33.)

In common-fund cases in *federal* court, requests for attorney fees are frequently awarded under a percentage-of-recovery method.  (*Lealao*, *supra*, 82 Cal.App.4th at p. 26.)[7]  Under this method, fees are awarded as a percentage of the fund created by the

---

[7] Federal courts have had an on-again, off-again attraction to the percentage-of-recovery method.  (See *In re Washington Public Power Supply System Securities Litigation* (9th Cir. 1994) 19 F.3d 1291, 1297-1298 [describing the "circular" journey of federal courts' reliance on the percentage-of-recovery method].)  In discussing the federal-court history of the percentage-of-recovery method, the *Lealao* court observed the method was generally preferred by federal courts before the 1970's.  (*Lealao*, *supra*, 82 Cal.App.4th at p. 26.)  But in the early 1970's, many federal courts adopted the lodestar method, "stimulated by the view" that the percentage-of-recovery method was "yielding fee awards that were excessive and unrelated to the work actually performed by counsel."

settlement. (*Id.* at p. 27.) Federal courts have increasingly modified this method by allowing trial courts to increase or reduce awards based on many of the same factors considered under the lodestar method. (See, e.g., *McDaniel v. County of Schenectady* (2d Cir. 2010) 595 F.3d 411, 422.) The extent to which the percentage-of-recovery method should be relied upon in common-fund cases litigated in California courts remains unresolved.[8]

Neither the lodestar method nor the percentage-of-recovery method is perfect, and both have plenty of critics. The shortcomings of the lodestar method include that it can "(1) 'increase[] the workload of an already overtaxed judicial system,' (2) [be] 'insufficiently objective and produce[] results that are far from homogenous,' (3) 'create[] a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law,' (4) '[be] subject to manipulation by judges who prefer to calibrate fees in terms of percentages of the settlement fund or the amounts recovered by the plaintiffs or of an overall dollar amount,' (5) 'encourage[] lawyers to expend excessive hours, and . . . engage in duplicative and unjustified work,' (6) 'create[] a disincentive for the early settlement of cases,' (7) deprive[] trial courts of 'flexibility to reward or deter lawyers so that desirable objectives, such as early settlement, will be fostered,' (8) 'work[] to the particular disadvantage of the public interest bar,' and (9) result[] in 'confusion and lack of predictability.' " (*Lealao*, *supra*, 82 Cal.App.4th at p. 29.) As the Second Circuit succinctly put it, the lodestar method creates "an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s]

---

(*Id*. at p. 28, fn. 2.) In 1985, however, federal courts started to once again prefer the percentage-of-recovery method because of perceived weaknesses in the lodestar method. Presently, some federal courts rely exclusively on the percentage-of-recovery method, while others allow varying degrees of consideration of the lodestar method in conjunction with the percentage-of-recovery method. (*Id*. at pp. 29-31.)

[8] Our state Supreme Court has accepted review in a case that will likely shed light on the issue, as it concerns whether a trial court may "anchor its calculation of a reasonable attorney's fees award in a class action on a percentage of the common fund recovered." (*Laffitte v. Robert Half International, Inc*. (*Brennan*), review granted Feb. 25, 2015, S222996.)

19

[trial] courts to engage in gimlet-eyed review of line-item fee audits." (*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.* (2d Cir. 2006) 396 F.3d 96, 121.)

The percentage-of-recovery method is far easier to apply and arguably "better aligns the interests of class counsel and class members . . . [by] ty[ing] the attorneys' fees award to the overall result achieved rather that the hours expended by the attorneys." (*Jones v. Dominion Resources Services* (S.D.W.Va. 2009) 601 F.Supp.2d 756, 759.) But it has its own serious shortcomings. Basing a fee award on a percentage of a monetary award is essentially an arbitrary measure of counsel's efforts, and it can bestow a windfall on class counsel when litigation efforts are modest and a large monetary award is obtained. (See, e.g., *In re Washington Public Power Supply System Securities Litigation*, *supra*, 19 F.3d at p. 1296 [reducing 25 percent fee request to amount equaling 4.7 percent of settlement fund because 25 percent of $687 million would have produced an excessive award of $171.75 million]; *In re High-Tech Employee Antitrust Litigation* (N.D.Cal. Sept. 2, 2015, 11-CV-02509-LHK) 2015 WL 5158730, at *8 ["find[ing] the lodestar method preferable to blind acceptance of percentages that seem largely untethered to the results achieved" in case involving "great disparity between the fees requested and the average recovery of individual class members"]; *Van Vranken v. Atlantic Richfield Co.* (N.D. Cal. 1995) 901 F.Supp. 294, 297-298 [reducing 40 percent fee request to 25 percent in lengthy and complicated case because, notwithstanding counsel's commendable efforts, 40 percent of $76 million settlement fund was excessive].)[9]

---

[9] The concern about bestowing a windfall has led some federal courts to modify the percentage-of-recovery method to provide for diminishing marginal rates as recoveries increase. (See, e.g., *In re Synthroid Marketing Litigation* (7th Cir. 2003) 325 F.3d 974, 980 [awarding 30 percent of first $10 million, 25 percent of second $10 million, 22 percent of $10 to 46 million, and 15 percent of higher amounts].) "Many costs of litigation do not depend on the outcome; it is almost as expensive to conduct discovery in a $100 million case as in a $200 million case. Much of the expense must be devoted to determining liability, which does not depend on the amount of damages; in securities litigation damages often can be calculated mechanically from movements in stock prices. There may be some marginal costs of bumping the recovery from $100 million to $200

Because of its arbitrariness, the percentage-of-recovery method can likewise confer an unreasonably small award when litigation was protracted or the relief obtained was monetarily modest. And in cases in which the class obtains full monetary relief irrespective of any fees award, it seems particularly artificial and pointless to suppress the fees award by strictly adhering to a percentage figure.

In addition to allowing both over- and under-compensation of fees, the percentage-of-recovery method has the additional shortcomings of encouraging counsel to avoid difficult cases, promoting premature settlements, reducing attorney accountability, and conveying to the public an appearance of attorney impropriety or conflict when a fees award is large and the class claimants' recoveries are small. (See *People ex rel. Dept. of Transportation v. Yuki* (1995) 31 Cal.App.4th 1754, 1769; *Chun v. Board of Trustees of Employees' Retirement System of State of Hawai'i* (2000) 92 Hawai'i 432, 443-445.)

Still, some federal circuits have seemingly embraced the percentage-of-recovery method as the proper standard. (See, e.g., *Swedish Hospital Corp. v. Shalala* (D.C. Cir. 1993) 1 F.3d 1261, 1267; *Camden I Condominium Association, Inc. v. Dunkle* (11th Cir. 1991) 946 F.2d 768, 711.) But most courts, including most federal courts and California appellate courts, have recognized that both the lodestar and percentage-of-recovery methods have their pros and cons, and these courts allow the reasonableness of a fee request to be cross-checked by comparing one method against the other. (See, e.g., *Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 503, 512 [affirming trial court's approval of fees award based on percentage of the recovery, after a lodestar " 'cross-check to test the reasonableness of the amount' "]; *Consumer Privacy Cases, supra,* 175 Cal.App.4th at p. 557 [considering both methods " 'anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary' "]; see also *Bluetooth Headset Products*

___

million, but as a percentage of the incremental recovery these costs are bound to be low. It is accordingly hard to justify awarding counsel as much of the second hundred million as of the first." (*Silverman v. Motorola Solutions, Inc.* (7th Cir. 2013) 739 F.3d 956, 959.)

*Liability Litigation* (9th Cir. 2011) 654 F.3d 935, 944, 945 ["we have also encouraged courts to guard against an unreasonable result by cross-checking their calculation against a second method," and the "lodestar method can 'confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate' "].)

No matter which method is used, " '[t]he ultimate goal . . . is the award of a "reasonable" fee to compensate counsel for their efforts, irrespective of the method of calculation.' [Citations.]" (*Apple Computer, Inc. v. Superior Court* (2005) 126 Cal.App.4th 1253, 1270.)

        *c.*     *Analysis.*

The parties build their arguments around the assumption that the trial court used the percentage-of-recovery method in awarding fees because the amount awarded was 37.5 percent of the settlement funds. But, in our view, this assumption is mistaken. Under the settlement approved by the trial court, the 37.5 percent figure was not the amount of fees class counsel *would* be awarded but was instead the *cap* on the amount of fees that *could* be awarded. In seeking a fees award, class counsel did not contend that they were simply entitled to 37.5 percent of the settlement amount. Instead, they submitted extensive lodestar evidence of the number of hours they worked and the market rate for their services, established that the resulting lodestar calculation amounted to a figure exceeding $15 million, but only asked for $3,056,250 because it conformed to the 37.5 percent cap.[10]

Class counsel's lodestar evidence was "entitled to credence in the absence of a clear indication the records [were] erroneous." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 396.) And once this evidence was presented, the burden shifted to the objectors to present specific objections, supported by rebuttal evidence. (1 Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 3d ed.

---

[10] Because the court did not employ a percentage-of-recovery method in awarding fees, we need not resolve the parties' dispute over whether there is a 25 percent "benchmark" for percentage-of-recovery awards in federal court and whether such a benchmark should apply in California proceedings.

2010) §§ 11.58-11.60.) But the objectors submitted no such evidence, and they did not sustain their burden by simply complaining that the amount requested was excessive. (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 ["General arguments that fees claimed are excessive, duplicative, or unrelated do not suffice"]; see also *Avikian v. WTC Financial Corp.* (2002) 98 Cal.App.4th 1108, 1119; *Children's Hospital and Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 782.)

In considering the reasonableness of the fee request here, the trial court could therefore accept the undisputed lodestar evidence to assure itself that the cap applied, i.e., that 37.5 percent of the settlement fund—$3,056,250—was less than the lodestar. It could accept that class counsel spent over 35,000 hours on the case, that the lodestar exceeded $15 million, and that the award would compensate class counsel in the amount of approximately $85 per hour. We can find nothing wrong with the trial court's approach or with its conclusion that the "[the award] falls well within the range of what is reasonable for complex antitrust class actions generally and under the specific circumstances of this case."

In our view, a trial court acts appropriately—and it certainly does not abuse its discretion—when it accepts in a common-fund case a cap on fees, even a cap that is phrased in terms of a percentage of the recovery, when the application of the cap results in a *lower* award than would be authorized under the lodestar method. The lodestar method is, after all, the primary means of calculating the reasonableness of attorney fees in California. (*Serrano v. Priest, supra,* 20 Cal.3d at p. 48, fn. 23.) When a court applies a cap to reduce this presumed reasonable amount, and thereby increases class relief, we cannot see how anyone is harmed, least of all the class members, including any objectors.[11] Applying such a cap is consistent with and furthers the trial court's responsibilities to protect the class from having to pay excessive fees to class counsel.

---

[11] This is not necessarily true when a trial court considers whether to *increase* a fee award above the lodestar by comparing the lodestar to a higher percentage-of-recovery calculation. (See *Lealao*, *supra*, 82 Cal.App.4th at p. 49.)

23

The trial court here found its fees award to be "fair, just and reasonable to the Class" after considering factors such as "the results achieved, the complexity of the issues, the experience of counsel, the contingency nature of the case, the length of time from initiation to settlement, the lodestar and multiplier amounts, costs reasonably expended by counsel, [and] the amount of attorneys' fees and expenses compared to the value of the settlement." We simply cannot conclude on this record that the trial court abused its discretion in approving the settlement and awarding attorney fees in the approved amount.

>           d.       *The trial court's review of the records.*

The objectors argue that the trial court "did not adequately review the hours expended." Again, we disagree.

To begin with, the record reflects that the trial court did review the records. The court specifically mentioned its concerns about some of the reimbursements sought, requested additional information, and stated it had "reviewed further [albeit unspecified] evidence to support the requested costs" after the May 2 settlement-approval hearing. The court then found the fee request to be "fair, just and reasonable to the Class" after considering the factors mentioned above. We have no basis upon which to accept the objectors' contention that the trial court failed to adequately review the records. (See *Wershba*, *supra*, 91 Cal.App.4th at pp. 254-255.)

Furthermore, the trial court's review of the evidence was in the context of determining whether the 37.5 percent cap applied. "Of course, where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." (*Goldberger v. Integrated Resources, Inc.* (2d Cir. 2000) 209 F.3d 43, 50.) The record reflects that the trial court more than satisfied its obligation. It observed, "Ordinarily, I would have some difficulty with the amount of evidence that I was provided to justify the amount of work that was put into this case. I say 'ordinarily,' but in this particular case, we have some really unique circumstances. We have almost ten

24

years of litigation. We have [a 37.5] percent lodestar,[12] which plaintiffs claim is about 20 percent of what was actually incurred. So even if I thought, for example, that some of the fees and the rates and the fees were unreasonable, we might get up to 50 percent of the lodestar or something like that." Stated differently, the court reviewed the billing records and had some concerns with them, but found that these concerns, even if validated by a more meticulous review of the records, would not come close to reducing the lodestar by 80 percent so as to place in doubt the application of the 37.5 percent cap. We think that the court's observations and approach were eminently reasonable.[13]

DISPOSITION

The judgment is affirmed. Costs are awarded to respondents.

---

[12] The court used the word "lodestar," but the point it was making can only be understood if it intended to refer to the 37.5 percent *cap*.

[13] In another indication that it was not simply rubber stamping class counsel's request, the court questioned class counsel's requested expenses. Class counsel were permitted to submit additional evidence supporting their request for these expenses.

 

 

 

 

 

 

 

 

 

 

 

 

 

                                               _____

                                               Humes, P.J.

 

 

We concur:

 

 

_____

Margulies, J.

 

 

_____

Banke, J.

 

 

 

 

 

 

*Roos v. Honeywell* (A142156)

 

 

26

Trial Court:                              San Francisco County Superior Court

Trial Judge:                              Honorable Curtis E. A. Karnow

Counsel for Objector and                  Law Offices of Darrell Palmer, Joseph Darrell Palmer
Appellant Art Rogers:

Counsel for Objector and                  Koch & Scow, Steven B. Scow
Appellant Amanda Waldenville

Counsel for Objector and                  Denise H. Gibbon
Appellant Chuck Congdon

Counsel for Objector and                  Law Office of Michael Creamer
Appellant Richard Moser:

Counsel for Plaintiff and                 The Mogin Law Firm, Daniel J. Mogin, Jodie M.
Respondent Joel I. Roos:                   Williams, Sarah B. Abshear; Abbey Spanier, Stephen
                                          T. Rodd; Shaheen & Gordon, Christine Craig; Gross &
                                          Belsky, Terry Gross, Adam C. Belsky, Monique
                                          Alonso; Law Offices of Alexander M. Schack,
                                          Alexander M. Schack

Counsel for Defendant and                 O'Melveny & Myers LLP, Michael Frederick Tubach,
Respondent Honeywell                      Christina J. Brown
International, Inc.